# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**F. THOMAS SCHORNHORST**
Oxford, Mississippi

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JERRY L. KINDRED, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 28A01-1202-PC-50 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE GREENE SUPERIOR COURT
The Honorable Dena A. Martin, Judge
Cause Nos. 28D01-0901-FA-38 & 28D01-1101-PC-32

**September 12, 2012**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

This case involves an allegation of sexual molestation for which there was no evidence other than a child's testimony. In 2010, Jerry L. Kindred was convicted of one count of Class A felony child molesting. He was sentenced to thirty-five years in prison, with five years suspended to probation. Kindred filed an appeal but later sought a stay of that appeal to pursue post-conviction relief, alleging ineffective assistance of counsel. Kindred now appeals the denial of his request for post-conviction relief and reinstates his direct appeal utilizing the *Davis-Hatton* procedure.[1]

Kindred raises several direct appeal and post-conviction claims, one of which we find dispositive of his appeal. Accordingly, we address only that issue, which is: did the admission of certain evidence, including hearsay and vouching testimony, deny Kindred a fair trial and therefore constitute fundamental error? We reverse and remand.

**Facts and Procedural History**

Kindred met Barbara Grissom in 2001. Barbara is the biological grandmother and adoptive mother of A.G. Barbara's ex-husband, David, was A.G.'s step-grandfather and is her adoptive father. Barbara and David were divorced in 2002, and Kindred and Barbara began living together shortly thereafter. Barbara and David later attempted to reconcile, which ended badly, and A.G. struggled with this. As a result, the relationship

---

[1] The *Davis-Hatton* procedure involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a post-conviction relief petition to be pursued in the trial court. *State v. Lopez,* 676 N.E.2d 1063, 1069 (Ind. Ct. App. 1997) (citing *Hatton v. State*, 626 N.E.2d 442 (Ind. 1993), *trans. denied*; *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149 (1977)). *See also* Ind. Appellate Rule 37(A) ("At any time after the Court on Appeal obtains jurisdiction, any party may file a motion requesting that the appeal be dismissed without prejudice or temporarily stayed and the case remanded to the trial court . . . for further proceedings. The motion must be verified and demonstrate that remand will promote judicial economy or is otherwise necessary for the administration of justice.").

between Barbara and her family was strained. Kindred's relationship with Barbara's family was similarly rocky.

After Barbara and David's divorce, A.G. lived primarily with David, but she had weekly visits with Barbara. In the summer of 2008, nine-year-old A.G. spent six consecutive weeks with Barbara. During that time, A.G. shared a bed with Barbara and sixty-four-year-old Kindred because she was scared to sleep alone. Barbara would sleep in the middle of the bed, with A.G. on one side and Kindred on the other. Barbara often woke up around 3:30 in the morning to prepare for her shift at a local restaurant that began at 4:30. Before getting ready, Barbara would wrap A.G. in blankets and put a blanket in between the still-sleeping A.G. and Kindred to keep A.G. from rolling in her sleep. Once Barbara was dressed, she would wake A.G. and drive her to the babysitter's house before going to work.

In late June, when the visit ended, A.G.'s biological mother, Christy, picked A.G. up from Barbara and Kindred's house. While Christy and A.G. were in the car, A.G. asked Christy if Barbara would live with David again if Barbara had nowhere else to live. Christy asked A.G. why she had asked such a question. A.G. told Christy that when she and Kindred were alone in bed together, Kindred put his hands down her panties. Christy told David that A.G. had been molested. They contacted law enforcement and said that A.G. had accused Kindred of touching her.

Don Fish, a caseworker for Greene County Child Protective Services (CPS), and Julie Martin, a sex-crimes investigator employed by the Greene County Prosecutor's Office, conducted forensic interviews of A.G. A.G. told Fish and Martin that Kindred

3

had put his finger in her vagina more than once.[2]  Fish and Martin also interviewed

Kindred, who admitted that he slept in the same bed as A.G., sometimes without Barbara.

However, he denied ever touching A.G. in a sexual manner, although Fish and Martin

testified at trial that he nodded his head affirmatively while making this verbal denial.

Kindred's interview was recorded on audio.  In January 2009, the State charged Kindred

with two counts of Class A felony child molesting.  Count I alleged that Kindred

molested A.G. in May 2008.  Count II alleged that Kindred molested A.G. in June 2008.

Before trial, the State sought to preclude Kindred's planned impeachment of A.G.

with a past false accusation of molestation.  Specifically, Kindred sought to introduce

evidence that, when A.G. was three or four years old, she accused one of Christy's

boyfriends of putting his finger in her vagina.  In a pretrial deposition, A.G. denied

making the accusation.  Christy and Barbara, however, testified that A.G. made the

allegation and later recanted it.  The trial court ruled that there was sufficient evidence of

a demonstratively false accusation under *State v. Walton* and allowed the impeachment.[3]

Kindred was represented at trial by Ronald Chapman ("trial counsel").  The

State's first witness was Martin, the prosecutor's sex-crimes investigator.  Martin

---

[2] Specifically, A.G. said that Kindred would "dig" deep in her private area with his hand.  Fish then asked "[D]oes he try to go inside you?"  A.G. responded, "I guess."  Petitioner's Ex. 4, p. 12.  A.G. said this happened "lots of times."  *Id.* at 13.

[3] In *State v. Walton*, our Supreme Court held that a defendant's offer of evidence of prior false accusations of rape to impeach the credibility of the witness does not violate the Rape Shield Rule or Indiana Evidence Rule 608.  715 N.E.2d 824, 827 (Ind. 1999).  Under *Walton*, evidence of prior false accusations may be admitted if: (1) the complaining witness admits he or she made a previous false accusation or (2) the accusation is demonstratively false.  *Id.* at 828.  In determining what is demonstratively false, the Court held that "while no bright line rule can be established," the standard is "more stringent than a mere credibility determination."  *Id.*

4

described her role in determining whether charges were filed when a sex crime was alleged:

> Q   Suppose you have an incident where the victim has accused someone of molesting [him or her], do you always file charges automatically?
>
> A   No.
>
> Q   Why not?
>
> A   We need some kind of [corroboration,] either DNA evidence, medical evidence[,] or possibly a confession by the suspect.
>
> Q   Are there times when you don't file charges?
>
> A   Yes.
>
> Q   Do you often have times when people are upset with you for those decisions probably don't you [sic]?
>
> A   Extremely upset, I have been told I am not doing my job-

Tr. p. 350. At that point, trial counsel objected on relevancy grounds. *Id.* at 351. The objection was overruled. The State circled back to the issue:

> Q   So on a daily basis you require some evidence other than child molest victim's accusations before filing charges?
>
> A   Yes.

*Id.*

Martin went on to testify that in this case, she decided to file charges after speaking with A.G. on three occasions. *Id.* at 356. When asked what she had learned over the course of her investigation, Martin replied, "We learned that [A.G] had been molested by . . . Jerry Kindred." *Id.* at 358. Martin said that "A.G. told us that Jerry

5

Kindred had put his finger in her vagina on more than one occasion." *Id.* at 363. Martin also testified that no medical examination of A.G. was conducted because "A.G. said that the last time it had happened was a couple of weeks prior to her telling[,] which was on June 21," and because the alleged molestation had occurred approximately two weeks earlier, "they wouldn't find anything anyway[,] the vagina heals very quickly." *Id.* at 365. Martin also testified about her interview with Kindred. Martin said that Kindred denied the allegations but "[corroborated] everything [A.G.] had told us other than the touching." *Id.* at 381.

When asked specifically about A.G., Martin testified that A.G.'s "story has been consistent with the allegations every time that I have talked to her." *Id.* at 382. She also described A.G.'s demeanor as "never chang[ing] from the first time I talked to her," and said that "[A.G.] has never been emotional with me, she [is] just matter-of-fact and to the point." *Id.* at 356.

When A.G. took the stand, the prosecutor asked, "Why are you here?" A.G. responded: "Because Jerry Kindred sexually abused me." *Id.* at 402. When the prosecutor remarked that A.G. had used "a pretty big word for a fifth grader," A.G. replied, "Well I know it is not specific to say just abuse, or know [sic] that he sexually abused me so I put that word there." *Id.* A.G. denied that anyone had told her to use the terms "sexual abuse." *Id.*

A.G. said that when she stayed with Barbara, Jerry touched her vagina, "sometimes rough and sometimes gentle." *Id.* at 415. When asked how long Kindred would "keep his finger in there," A.G. responded, "I don't know, 15 or 10 minutes

6

maybe." *Id.* at 418. A.G. testified that she did not call for Barbara because she was too scared and because she "[thought] there was a gun in the room."[4] *Id.* When the prosecutor asked A.G. what led her to tell Christy about the molestation, A.G. responded:

A    Well I kind of had to, I was making plans to see if [Barbara] would live with [David] after it happened, I can't remember, but I think [Barbara], I might have asked her and she might have said yes and when I asked [Christy] if she would think [David] would and she asked why and I had to tell her.

Q    Why did you think this had anything to do [with] where [Barbara] was going to live?

A    Well I thought she would be upset with him, with Jerry[,] after she found out what happened.

*Id.* at 420.

CPS caseworker Fish also testified about the investigation. Fish elaborated on Martin's response about seeking medical treatment for A.G.: "I attended a training session . . . and during that training [it was] explained to us that most evidence is gone within 72 hours, [so] there is no need to do the examination." *Id.* at 433-34. Fish also relayed A.G.'s statement—initially made to Christy, who told David, who reported it to Fish—that "she had been touched." *Id.* at 438-39. Similarly, Fish testified that Christy had informed him that A.G. "had indicated that she had been touched." *Id.* at 439. Fish also testified about A.G.'s demeanor, describing A.G. as "matter-of-fact." *Id.* at 440, 449. He also said that A.G.'s demeanor before and after talking to the investigators was the same. When asked by the State if A.G. had indicated specifically that Kindred

---

[4] This was not the only reference to guns possessed by Kindred, who was a federally licensed firearms dealer. In fact, the prosecutor made numerous references to Kindred owning guns, even at one point implying that Kindred sold guns illegally. *See* Tr. p. 598-99, 624-25, 630, 641, 674. Kindred also asserts this as a basis for fundamental error; however, we need not address this issue due to our resolution of Kindred's other arguments.

touched her on June 21, 2008, Fish said, "She indicated that she had been in Worthington, had been in a bed with Jerry Kindred and that he had reached over and had placed his finger inside her vagina." *Id.* at 448.

The State then sought to introduce into evidence the audio recording of Kindred's interview with Fish and Martin. Without objection from Kindred's trial counsel, the entire forty-minute recording was admitted into evidence and played for the jury. *Id.* at 460. An un-redacted thirty-one-page transcript of the recording was also given to each juror. No limiting instruction was given to the jury regarding the recording. During the interview, Fish made many statements about A.G. and the allegations, including the following:

> *[A.G. is] pretty truthful.* I mean when you talk to her she's pretty detailed about the things that were going on, things that had happened and the things that were said to her. And that, and when you talk to this little girl, this [nine-year-old] little girl, and you, you try to look at the things that she's saying and *[the] way she's telling it, it's pretty believable.* I mean especially whenever some of the facts that you tell me kinda [sic] match with the facts that she's telling me.

> \*     \*     \*     \*     \*

> And, and *that's one of the things that makes this girl more believable.* Is the fact that a lot of times when these things happen, they don't happen for hours or days or anything like that, these are quick things . . . they're just you know[,] people leaned over, they touch people and then they're done. It's not . . . something that, that they do for hours. And . . . that's one of the things that makes this girl, *one of the things that makes this girl believable* is the fact that she's not, she's not saying [Kindred] never did this for hours, [Kindred] never hurt her, [Kindred] never meant to, to be mean to her, that, that she never indicates that at all. She just says that [Kindred] touched her. Ok? And, and that's what we've, we've got to find out [Kindred], and, and when you talk to her, she is really, she has a lot of details. About what went on in that bed. And, and *she's real believable . . . .*

> \*     \*     \*     \*     \*

8

And I don't think you meant to hurt her or, or you hurt her at all, ok? I don't think that's what we're talking about. But I think, I honestly think that something happened in that bedroom that, uh, was out of your control for whatever reason that something happened, maybe just a couple of seconds and . . . you leaned over and you touched the little girl and that's all the farther [sic] it went.

\*     \*     \*     \*     \*

[Y]ou touched her, ok, and that's all she's saying. That you touched her and, and that's all we're talking about.

\*     \*     \*     \*     \*

Well, she is really adamant that it was you . . . [S]he's saying that as she would wake up and it would be Barbara getting ready for work in just those few minutes and that you would reach over and would touch, touch her on, on the hip.

State's Ex. 1, p. 27-30 (emphases added).

Finally, Fish testified that he was trained to identify signs that a child has been "coached," including providing rehearsed answers, repeating answers, and an inability to provide details about the incident. Tr. p. 435-36. Fish stated twice that he did not believe A.G. had been coached. *Id.* at 449, 470. Barbara, Christy, and David also testified and repeated what A.G. had said about the alleged molestation. *Id.* at 500, 525, 551. David, however, testified that he had not specifically asked A.G. about the allegations because he knew that she would tell the truth and "wouldn't lie." *Id.* at 553, 555.

In April 2010, the jury found Kindred not guilty on Count I (molestation occurring in May 2008) and guilty on Count II (molestation occurring in June 2008). Kindred was sentenced to thirty-five years in the Department of Correction, with five years suspended to probation. Kindred filed an appeal in June 2010, but he later sought a stay of that

9

appeal to pursue post-conviction relief, alleging ineffective assistance of counsel. On post-conviction, Kindred claimed his trial counsel was ineffective for failing to object to the admission of hearsay and vouching testimony, among other evidence. Following the hearing, the post-conviction court entered findings of fact and conclusions of law denying relief.

Kindred now appeals the denial of his request for post-conviction relief and reinstates his direct appeal.[5]

**Discussion and Decision**

Kindred raises several direct appeal and post-conviction claims, one of which we find dispositive of his appeal. Accordingly, we address only that issue, which is: did the admission of certain evidence, including hearsay and vouching testimony, deny Kindred a fair trial and therefore constitute fundamental error?

With one exception, Kindred did not object to the admission of the evidence he now challenges on appeal. The single issue preserved for appeal is Kindred's relevancy objection to Martin's testimony regarding her role in filing charges at the prosecutor's office. We review the admission of that evidence for an abuse of discretion. *Kimbrough v. State*, 911 N.E.2d 621, 631 (Ind. Ct. App. 2009) (citations omitted). An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*.

---

[5] We held oral argument in this case on August 21, 2012. We thank counsel for both parties for their able advocacy.

As to all of Kindred's other contentions, his claims are waived unless he can show that fundamental error occurred. *Kimbrough*, 911 N.E.2d at 634. The fundamental-error rule is extremely narrow. *Id.* Fundamental error occurs only when the error "constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.*

## I. Course-of-investigation Evidence

We first address Kindred's challenge to Martin's testimony regarding her role in charging decisions. He also challenges numerous statements made by Martin and Fish regarding what A.G. told them during the forensic interviews. In its brief and at oral argument, the State claimed that this was properly offered as course-of-investigation evidence.

Course-of-investigation evidence is often offered to explain why police officers, investigators, or other law enforcement officers proceeded in a particular manner. "This 'background' information, however, generally is irrelevant and should be excluded." 1 Wharton's Criminal Evidence § 4:47 (15th ed. 1997). It is irrelevant if it does not make it more or less probable that the defendant committed the acts alleged. "In other words, the explanation for why the police did what they did may add nothing to the determination of the defendant's guilt or innocence." *Id.* While jurors may be curious about why investigators acted, an explanation of their actions may have no probative value. *Id.* (citation omitted).

In this case, Martin described her role in making charging decisions:

Q    Suppose you have an incident where the victim has accused someone of molesting [him or her], do you always file charges automatically?

A    No.

Q    Why not?

A    We need some kind of [corroboration,] either DNA evidence, medical evidence[,] or possibly a confession by the suspect.

Q    Are there times when you don't file charges?

A    Yes.

Q    Do you often have times when people are upset with you for those decisions probably don't you [sic]?

A    Extremely upset, I have been told I am not doing my job-

*    *    *    *    *

Q    So on a daily basis you require some evidence other than child molest victim's accusations before filing charges?

A    Yes.

Tr. p. 350-51. The State argues that Martin's testimony was proper course-of-investigation evidence. At trial, Kindred's trial counsel argued that this testimony was irrelevant. *Id.* at 351. The trial court overruled Kindred's objection.

The fact that Martin generally requires corroborating evidence before filing charges is irrelevant—it does not make it more or less probable that Kindred committed the acts alleged by A.G. Nor was Martin's charging criteria at issue at Kindred's trial. Thus, the trial court should have excluded her testimony on this basis alone. Moreover, Martin's testimony carries with it the threat that jurors would infer that because she requires corroborating evidence in the form of DNA, other medical evidence, or a

12

confession, that one or more of those items were present in this case. We acknowledge, as the State implied at oral argument, that charging criteria may be an area of interest for jurors. However, this fact does not justify the admission of irrelevant and potentially prejudicial testimony. We conclude that the trial court erred by admitting this evidence.

In addition to being irrelevant, course-of-investigation evidence may also contain hearsay. Indeed, "cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted." 2 McCormick on Evidence § 249 (4th ed. 1992). While the need for this evidence "is slight, the likelihood of misuse [is] great." *Id.* Here, Kindred challenges numerous statements made by Martin and Fish regarding what A.G. told them during the forensic interviews and argues that this was improperly offered as course-of-investigation evidence.

Our Supreme Court has examined course-of-investigation evidence that contains otherwise inadmissible hearsay and in doing so, has questioned its relevancy. In *Craig v. State*, 630 N.E.2d 207, 212 (Ind. 1994), the defendant, accused of child molesting, objected to the testimony of a police officer describing an out-of-court statement made by the victim's mother that two weeks after seeing the defendant, the victim said that the defendant molested him. The State argued that the testimony was not offered to prove the truth of the matter asserted, but rather to explain the course of the investigation—to show that a report was made and that the police acted on it. The Court disagreed, ruling that the testimony had "no conceivable relevance apart from proving the facts asserted in the statements." *Id.* at 211. The error in admission was harmless, however, because

13

"there was little to undermine the credibility of the [victim] . . . and the tendency of [the investigators'] statements to bolster his credibility had only a minor impact on the jury." *Id.* at 211-12. *See also Maxey v. State*, 730 N.E.2d 158, 162 (Ind. 2000) (detective's testimony that defendant had fled the state was improper course-of-investigation evidence; testimony had "extremely low" probative value as defendant's ultimate apprehension was not a contested issue); *Mason v. State*, 689 N.E.2d 1233, 1236 (Ind. 1997) ("What prompted the police to investigate Mason is not relevant to any contested issue at trial because Mason's defense efforts were directed primarily towards establishing that he was not dealing heroin . . . ."); *Bonner v. State*, 650 N.E.2d 1139, 1141 (Ind. 1995) (informants' statements that defendant was involved in drug trafficking "lacked relevance to any contested issue other than the matters asserted therein" and were improper as irrelevant or hearsay).

This Court has also questioned the relevancy of testimony offered as course-of-investigation evidence. In *Winbush v. State*, a police detective testified about information he had received about the defendants' past criminal acts. 776 N.E.2d 1219, 1221-22 (Ind. Ct. App. 2002), *trans. denied.* The State offered this testimony as course-of-investigation evidence over the defendants' objections. We concluded that this evidence had "little relevance" as the defendants were not contesting "the quality or validity of the investigation," but posed a high risk of prejudice and should not have been admitted at trial. *Id.* at 1222. Similarly, in *Hernandez v. State*, 785 N.E.2d 294, 300 (Ind. Ct. App. 2003), *trans. denied*, we concluded that a police captain's testimony about prior complaints of prostitution at a spa where the defendant was arrested and later charged

with prostitution were improperly admitted. Despite the fact that the claimed purpose of the captain's testimony was to show the course of the investigation, the "genesis of the investigation was not relevant to any contested issue" in the case while "the prejudicial impact was great." *Id.*[6]

In addition, the Seventh Circuit recently discussed course-of-investigation evidence in the Indiana case of *Jones v. Basinger*, 635 F.3d 1030, 1045 (7th Cir. 2011). In *Jones*, the State elicited testimony from two police officers regarding a confidential informant's double-hearsay statement. The officers' testimony was permitted on the theory that it showed the course of the investigation that ultimately led to Jones' arrest and conviction for felony murder. The federal court acknowledged that while "the reason a police investigation proceeded as it did could be said not to be inadmissible hearsay," the "reasons for an investigation are most assuredly not something the Government has to prove to carry its burden" of proof in a criminal trial. *Id.* (citations omitted). The court

---

[6] Although there was no objection to Martin and Fish's testimony regarding what A.G. said during the interviews, *Hernandez* sets forth succinctly the procedure for analyzing an objection to the admissibility of an out-of-court statement received by a law enforcement officer during the course of an investigation:

> When the admissibility of an out-of-court statement received by a police officer during the course of an investigation is challenged as hearsay, the court must first determine whether the testimony describes an out-of-court statement asserting a fact susceptible of being true or false. If the statement contains no such assertion, it cannot be hearsay and the objection should be overruled. The court then must consider the evidentiary purpose for the proffered statement. If the evidentiary purpose is to prove the fact asserted, and the statement is neither from a witness nor from a party as described in Ind. Evidence Rule 801(d), and there are no applicable hearsay exceptions, the statement is inadmissible as hearsay. If the statement is offered for a purpose other than to prove the truth of the matter asserted, the court should consider whether the fact to be proved is relevant to some issue in the case and whether the danger of unfair prejudice which may result from its admission outweighs its probative value.

785 N.E.2d at 298 (citations omitted).

also expressed skepticism about the use of course-of-investigation evidence given the threat of prejudice and abuse:

> Statements offered to show background or the course of the investigation can easily violate a core constitutional right, are easily misused, and are usually no more than minimally relevant. Courts asked to admit such statements for supposed non-hearsay purposes must be on the alert for such misuse. A trial court should not accept without scrutiny an offering party's representation that an out-of-court statement is being introduced for a material non-hearsay purpose.

*Id.* at 1046. In this case, the State elicited the following testimony from Martin and Fish:

> MARTIN: [A.G.] told us that Jerry Kindred had put his finger in her vagina on more than one occasion.

> MARTIN: [A.G.] said that the last time it had happened was a couple of weeks prior to her telling[,] which was on June 21.

> FISH: We talked to Christy, she informed us that she had been the one who had picked A.G. up[,] and as they were coming home to Bedford, A.G. had indicated that she had been touched.

> FISH: [A.G.] indicated that she had been touched.

> FISH: [A.G.] indicated that she had been in Worthington, had been in a bed with Jerry Kindred and that he had reached over and had placed his finger inside her vagina.

Tr. p. 363, 365, 438-39, 448. The State contends that these statements were not offered for the truth of the matter asserted, but instead were properly admitted as course-of-investigation evidence. We cannot agree. As in *Craig*, *Winbush*, and *Hernandez*, the genesis, development, or quality of Martin and Fish's investigation was not at issue. For this reason, as our Supreme Court said in *Craig*, another child-molesting case, the testimony here had no "conceivable relevance apart from proving the facts asserted in the statements." 630 N.E.2d at 211. Nor can we conclude that the admission of this

16

evidence was harmless. The threat of prejudice was considerable as A.G.'s credibility—unlike the victim's in *Craig*—was in question for numerous reasons, including a previous, demonstratively false accusation of molestation.

## II. Drumbeat Repetition

We next address Kindred's contention that this is a drumbeat-repetition case. Kindred argues that Martin and Fish's testimony as set forth above, as well as hearsay statements by Barbara, Christy, and David, created a prejudicial drumbeat repetition of the allegations against him.

In addition to Martin and Fish's testimony, Kindred also argues that Barbara, Christy, and David gave hearsay testimony:

> BARBARA: [A.G.] was hesitant and I just said [Christy] said that you are not coming back up and staying with me and [A.G.] said no[,] and I said [Christy] said that [Kindred] touched you and [A.G.] was hesitant and she said yes.

> CHRISTY: [A.G.] had told me that when [Barbara] would get out of bed that he would put his hands down her panties . . . .

> DAVID: [A.G.] told Christy on the way home [that she had been molested].

Tr. p. 500, 525, 551.

While seemingly conceding that the statements were hearsay, the State argues that they were nonetheless general, brief, and cumulative of A.G.'s testimony, and thus this is not a drumbeat-repetition case. We have addressed the issue of drumbeat evidence in child-molesting cases with differing results.

In *Stone v. State*, 536 N.E.2d 534 (Ind. Ct. App. 1989), the defendant was convicted of two counts of child molesting. Although we concluded that the trial court

17

did not err in admitting some of the child victim's out-of-court statements, we held that the defendant was prejudiced when the trial court, over the defendant's objection, allowed five witnesses to testify to the victim's out-of-court statements. *Id.* at 540. Between the five witnesses and the victim, the victim's version of the alleged molestation was presented to the jury seven times. We concluded that this was drumbeat repetition and reversed, explaining that the victim's credibility was "of critical importance," and "the line between [the victim's] credibility became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [the victim's] out-of-court statements." *Id.* at 540-41.

Our Supreme Court also expressed concern about drumbeat repetition of evidence in *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991). In *Modesitt*, the trial court, over the defendant's objection, allowed three witnesses to testify to the child victim's hearsay statements concerning the alleged molestation. The court explained that "three witnesses told the victim's story before the victim herself testified" and the Court could not say that this "drumbeat repetition of the victim's original story prior to calling the victim to testify did not unduly prejudice the jury which convicted Modesitt." *Id.* at 651-52.

In two cases that followed, we found no drumbeat repetition. First, in *Willis v. State*, the child victim testified about being molested. 776 N.E.2d 965 (Ind. Ct. App. 2002). After the victim testified, her mother testified and the trial court admitted a videotape of the victim's interview with authorities. Both of these occurred despite the defendant's objection. Noting that the videotape revealed no evidence that the jury had not heard from the child victim, as well as the brief nature of the mother's testimony

18

about the molestation, we concluded that this did not amount to the drumbeat repetition found in *Modesitt*. *Id.* at 968.

We also found no drumbeat repetition in *Surber v. State*, 884 N.E.2d 856, 864-65 (Ind. Ct. App. 2008), *trans. denied*. In *Surber*, the child victim's statements about being molested were repeated by three witnesses, and a videotaped interview of the child describing the molestation was admitted into evidence without objection from Surber. Concluding that any error in admission was harmless, we noted that the victim was the first to testify and was cross-examined. *Id.* at 864. We also noted that the three witnesses' testimony "was brief, consistent with, and did not elaborate upon [the child victim's] testimony." *Id.*

Looking to the evidence here, we note that while Barbara, Christy, and David's testimony was brief, Martin and Fish testified at length. Martin's testimony, in particular, spans forty pages of the record, and she testified before the jury heard from A.G. In addition to hearing A.G.'s allegations from the mouths of Martin, Fish, Barbara, Christy, and David, the jurors also heard Kindred's entire forty-minute interview with investigators, during which Fish—not the child, as seen in *Surber* and *Willis*—repeatedly suggested that Kindred had touched A.G. and that A.G. was being truthful. Jurors also received an un-redacted transcript of the interview, which included these statements from Fish. In light of this, and because this case turned solely on the word of A.G., we cannot say that this drumbeat repetition of A.G.'s story did not prejudice the jury.

### III. Vouching Testimony

Kindred next contends that fundamental error occurred when three witnesses vouched for A.G.'s credibility.

Vouching testimony is generally prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This testimony is considered an "invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012).

Until recently, an exception was made to Evidence Rule 704(b) for vouching testimony in child-molesting cases, under the rationale that "'[t]he child's capacity to accurately describe a meeting with an adult which may involve touching, sexual stimulation, displays of affection and the like, is automatically in issue . . . .'" *Stewart v. State*, 555 N.E.2d 121, 125 (Ind. 1990) (quoting *Lawrence v. State*, 464 N.E.2d 923, 925 (Ind. 1984)), *abrogated on other grounds by Lannan v. State*, 600 N.E.2d 1334 (Ind. 1992). However, our Supreme Court recently decided *Hoglund v. State*, 962 N.E.2d 1230 (Ind. 2012), in which it expressly eliminated this vouching-testimony exception in child-molesting cases.

> In *Hoglund*, the Court, revisiting its holding in *Lawrence*, concluded that
>
> testimony concerning whether an alleged child victim is not prone to exaggerate or fantasize about sexual matters is an indirect but nonetheless functional equivalent of saying the child is telling the truth. It is this aspect of *Lawrence* that we today expressly overrule as being inconsistent with the mandate of Rule 704(b) which specifically prohibits witnesses from testifying as to whether another witness testified truthfully.

*     *     *     *     *

*To summarize, we expressly overrule that portion of Lawrence allowing for some accrediting of the child witness in the form of opinions from parents, teachers, and others having adequate experience with the child, that the child is not prone to exaggerate or fantasize about sexual matters.* This indirect vouching testimony is little different than testimony that the child witness is telling the truth.

*Id.* at 1236-37 (citations omitted) (emphasis added).

In this case, Fish testified that he did not believe that A.G. had been "coached." Tr. p. 449, 470. On appeal, Kindred contends that this statement was the functional equivalent of telling the jury that A.G. was telling the truth. The State contends that this was not vouching testimony, but rather a response to Kindred's trial strategy, which was to attack A.G.'s credibility and suggest that she had been coached or otherwise had reason to lie. Kindred and the State have identified the two main arguments regarding a witness's testimony about coaching. In child-molesting cases, particularly where there is no physical evidence, as is the case here, the central issue is likely to be the child's credibility. And in that instance, a defendant may suggest that the child was coached. Thus, this is an issue likely to be encountered with some frequency, but it has yet to be resolved by our courts.

While *Hoglund* prohibits testimony that an alleged child victim is not prone to exaggerate or fantasize about sexual matters, it does not expressly address testimony about coaching. However, in *Hoglund*, our Supreme Court discussed foreign-jurisdiction cases that reference coaching testimony:

In *State v. Keller*, 315 Or. 273, 844 P.2d 195 (1993), the Oregon Supreme Court repeated the admonition that a "witness may not testify about the credibility of another witness," *id.* at 202, and found error in allowing a pediatrician—whose specialty was child abuse and neglect—to testify that

21

"there was no *evidence of leading or coaching* or fantasizing" during her interview with the child.

962 N.E.2d at 1234-35 (emphasis added). *Hoglund* also discussed the Ohio Supreme Court's ruling in *State v. Boston*, 545 N.E.2d 1220, 1240 (Ohio 1989), which

> described as "improper . . . egregious, prejudicial and . . . reversible error" for the trial court to allow the child victim's pediatrician to express her opinion that the victim "had not fantasized her abuse" and that the victim "*had not been programmed to make accusations against her father.*" [A]ccording to the Court this testimony 'in effect, declared that [the victim] was truthful in her statements.'

*Hoglund* at 1235 (emphasis added).

We read *Hoglund* to suggest that testimony about whether a child has been coached amounts to the same improper commentary on the child's truthfulness as testimony about whether a child is prone to exaggerate or fantasize about sexual matters. We hold that general testimony about the signs of coaching, as well as the presence or absence of those signs in the child victim at issue, preserves the ultimate credibility determination for the jury and therefore does not constitute vouching. By contrast, where a witness opines as to whether the child victim was coached—offering an ultimate opinion, as Fish did here—the witness invades the province of the jury and vouches for the child.

We also conclude that Fish vouched for A.G.'s credibility indirectly though the admission of the audio recording of his interview with Kindred. During the interview, Fish stated five times that A.G. was "truthful" or "believable." Petitioner's Ex. 1, p. 27-28. The jurors heard these statements when the interview was played in the courtroom and read them in the transcript of the recording. A.G.'s father, David, also vouched for

22

A.G.'s credibility when he stated at trial that he never questioned the allegations made by A.G. because he knew that she would tell the truth and "wouldn't lie." Tr. p. 553, 555. While these statements were made by A.G.'s father and did not convey any specific knowledge about the allegations, they nonetheless vouched for A.G.'s credibility.

## IV. Cumulative Error

We need not determine whether any single error in the admission of vouching, hearsay, or other evidence detailed above was fundamental because we conclude that the *cumulative* effect of the admission of this evidence is fundamental error.[7] We reach this conclusion because of the unique facts of this case, which turned entirely on A.G.'s credibility: A.G. alleged that Kindred put his finger inside her vagina. She was impeached with testimony regarding a prior, demonstratively false accusation of precisely the same molestation she claimed Kindred committed. Before A.G. made this allegation, she inquired about where Barbara would live if she no longer lived with Kindred. At trial, A.G. explained that she was "making plans to see if [Barbara] would live with [David] after it happened," and it was implied that A.G. hoped her parents would reconcile if Kindred was out of the picture. There was also testimony about the difficult dynamic between A.G.'s family and Kindred. Importantly, there was no physical or other evidence to corroborate A.G.'s allegations. Considering these facts in light of the extensive hearsay and vouching testimony that was admitted in error, we conclude that Kindred was denied a fair trial, and we reverse his conviction.

---

[7] Given our resolution of this issue, we need not address Kindred's remaining direct-appeal or post-conviction claims.

23

Having reached this conclusion, the question of whether Kindred may be subjected to a new trial depends upon an analysis of the sufficiency of the evidence. *Browning v. State*, 775 N.E.2d 1222, 1226 (Ind. Ct. App. 2002). When determining whether retrial is permissible, we consider all of the evidence admitted at trial, including the erroneously admitted evidence. *Id.* "If, viewed as a whole, that evidence would have been sufficient to sustain the judgment, retrial would not offend double jeopardy principles." *Id.* The uncorroborated testimony of a child victim is sufficient to support a conviction for child molesting. *Stewart v. State*, 768 N.E.2d 433 (Ind. 2002) (citing *Barger v. State*, 587 N.E.2d 1204, 1308 (Ind. 1992)). Because A.G.'s testimony would be sufficient to justify a conviction, jeopardy has not attached and Kindred may be retried.

Reversed and remanded.

CRONE, J., and BRADFORD, J., concur.