## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 17 2020, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Victoria Bailey Casanova
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Jesse R. Drum
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Roy Hudnall,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

December 17, 2020

Court of Appeals Case No.
20A-CR-498

Appeal from the
Noble Circuit Court

The Honorable
Michael J. Kramer, Judge

Trial Court Cause No.
57C01-1901-F5-2

**Vaidik, Judge.**

# Case Summary

[1] Roy Hudnall appeals his convictions for one count of stalking and two counts of invasion of privacy. We remand to the trial court to vacate the invasion-of-privacy convictions but affirm in all other respects.

# Facts and Procedural History

[2] The evidence most favorable to Hudnall's convictions is as follows. Hudnall and T.H. married in 2007 and have two children, B.H., born in 2008, and C.H., born in 2017. Hudnall and T.H. separated in June 2018. The next month, T.H. obtained a protective order against Hudnall. Over the next six months, these violations of the protective order occurred:

- On August 6, 2018, Parkview Health Police Officer Matthew Wolfe was dispatched to Parkview Home Health and Hospice in Kendallville after reports of a suspicious vehicle. Officer Wolfe saw Hudnall parked in the lot facing nearby apartments, where T.H. lived. Hudnall had a rifle scope, which he was using to "look across the street" at T.H.'s apartment complex to "check[] on the well being of his son[.]" Tr. Vol. II pp. 217, 219.

- On October 7, 2018, Hudnall went to T.H.'s apartment, banged on her door, and yelled her name. When T.H. opened the door, Hudnall grabbed her by the hair, threw her to the ground, and then left. T.H. called the police, and Sergeant Nathaniel Stahl of the Kendallville Police

Department responded. T.H. was "distraught" and "crying" and stated Hudnall "scared the pee out of [her]." Tr. Vol. III pp. 99, 158. Sergeant Stahl spoke to a neighbor who witnessed some of the incident and whose description of the assailant matched Hudnall. Later that day, Sergeant Stahl went to Hudnall's home and arrested him.

- On November 7, 2018, Timothy Harkness, a Family Case Manager with the Noble County Department of Child Services, was conducting an assessment of T.H. and noticed she received at least eight calls from an unknown number. When T.H. finally answered one call, it was Hudnall. As Harkness was leaving, he saw Hudnall approach T.H.'s apartment. A few minutes later, Harkness saw Hudnall and T.H. arguing in the parking lot.

- On November 23, 2018, Officer Doug Davis of the Kendallville Police Department responded to a 911 call from T.H. When Officer Davis arrived, he saw Hudnall and T.H. in the parking lot. T.H. was "upset" and crying because "one minute [Hudnall's] like going crazy on [her] and the next minute he's like perfectly fine" and she "never know[s] exactly what he may and may not do." *Id.* at 161. She indicated to Officer Davis that Hudnall is like "[Doctor Jekyll] and Mr. Hyde." *Id.* Officer Davis arrested Hudnall for violating the protective order.

- On January 1, 2019, T.H. called Officer Kevin Pegan of the Kendallville Police Department and reported Hudnall had been following her throughout the day and then showed up at her apartment.

- On January 3, 2019, T.H. and a friend, Timothy Kienzler, went to a local tire store. Hudnall followed them and confronted T.H. and Kienzler. T.H. "fear[ed]" things would become physical and called the police, but when officers arrived Hudnall had already left. *Id.* at 164. T.H. and Kienzler reported Hudnall had threatened to kill T.H. *See* Ex. 16, 2:14-18. Officer Davis went to Hudnall's home and telephoned him, attempting to get him to come out of the home and speak with officers, with no success. Hudnall repeatedly insisted he was not home, and after Officer Davis said officers could see him in the home, Hudnall replied they were seeing his twin brother. Ex. 6, 2:44. After a few minutes, T.H. arrived at Hudnall's home and relayed to officers that B.H. was also in the house. Unable to get ahold of B.H. and fearing for his safety, officers eventually forced entry and arrested Hudnall.

[3] The State charged Hudnall with Level 5 felony stalking (between July 11, 2018, and January 3, 2019) and two counts of Level 6 felony invasion of privacy (for violating the protective order on January 1 and 3, 2019). The jury trial occurred over three days in January of this year.

[4] On the second day of trial, the State sought to introduce body-camera and car-camera footage from Hudnall's arrests on October 7 and November 23, 2018.

Hudnall objected because he had not been read his *Miranda* rights. The October 7 footage encompassed officers arriving at Hudnall's house, speaking with him on his porch, arresting him, and transporting him to jail. *See* Ex. 2. The court admitted the footage because "Hudnall was not in custody at the beginning of the tape" and once Hudnall was in the police car there was no "interrogation"; instead, "it was just voluntary statements made by Mr. Hudnall unprompted." Tr. Vol. III p. 15. The November 23 footage showed Officer Davis placing Hudnall in a police car after arresting him and transporting him to jail. *See* Ex. 4. The court also admitted the footage because Hudnall's statements were "voluntary" and any statements made by Officer Davis were "in response" to Hudnall. Tr. Vol. III pp. 20-21.

[5] The State also introduced an audio recording of a phone call between Hudnall and Officer Pegan on January 2, 2019. *See* Ex. 11. Hudnall did not object, and the court admitted the recording and played it for the jury. In the recording, Hudnall made two references to child-molesting accusations against him. After the first mention, Hudnall objected, and the court paused the recording. The court resumed playing the recording after a sidebar conference during which the deputy prosecutor told the court he believed there were no other references. However, the recording did contain a second mention of child-molesting accusations. *Id.* at 4:28. After the recording was finished, defense counsel stated he forgot those comments were in the recording, and had he remembered he would have asked for its exclusion or a redaction. The deputy prosecutor also

stated he did not realize those comments were in the recording. Hudnall asked for a mistrial, which the court denied, stating:

> if I'd known that it was in there I would have ordered that it not be, the recording not be played or that it be redacted. But um, I think, I think any error is harmless um, Mr. Hudnall was talking about people defaming him and, and that was part of the defamation and I, the sound quality was not very good and I don't if maybe jurors [sic] could understand a lot of what was said better than I could but I mean the child molest[ing] kind of jumped out at me among other things and I don't know whether he was accusing in that context someone else of child molest[ing] or that he was being accused and then as I said the second one I did not hear but in any event I'm going to deny the motion and find that any error was harmless.

Tr. Vol. III p. 80. The court offered to admonish the jury, but Hudnall chose not to have an admonishment as "it might just cause more attention." *Id.* Later that day, the deputy prosecutor notified the court he did have notes referencing the child-molesting comments in the recording but "when [he] had reviewed for the trial [he] didn't go through them [], at least not as sufficiently as" he thought he had. *Id.* at 101. The deputy prosecutor stated he "did not intend to mislead the court" through this "error." *Id.* Hudnall renewed his motion for a mistrial, which the court again denied.

[6] Later, the State introduced photographs taken by Sergeant Stahl of text messages and the call log on T.H.'s phone (Exhibits 21-64). Sergeant Stahl testified he took these photographs of T.H.'s phone on August 6 and October 7, 2018, and that based on his experience speaking with Hudnall, the text

messages matched how Hudnall spoke. Sergeant Stahl also stated T.H. told him the text messages were sent by Hudnall, and footage from Sergeant Stahl's body camera showed T.H. identified the messages as coming from Hudnall. Hudnall also "personally confirmed" that to be his phone number to Sergeant Stahl, and a video of Hudnall identifying that as his number was played to the jury. *Id.* at 94; Ex. 2, 6:59. Hudnall objected, but the court overruled and admitted all the exhibits except Exhibit 28. The content of the messages went "from begging to threatening to [] making all sorts of allegations[.]" Tr. Vol. III p. 226. Many messages included content personal to Hudnall: referring to B.H. and C.H. by name, including pictures of the children, referring to his "marriage" with T.H, and stating he was her "husband." Exs. 29, 55. Other messages referenced the ongoing court cases between T.H. and Hudnall. Finally, many of the text messages included threats to T.H. and indicated Hudnall knew of her whereabouts, including:

- I no where u r [T.H.] ur not that smart
- Left k'ville to eat at 9:00
- Really I'm waiting on u guys it's not gonna b pritty promise u that
- Were waiting on u you gotta come home sometime
- Keep ignoring me your just making things worse
- This got is not worth what's gonna happen to u he goes home ur still you fu**ing idiot
- [T.H.] I'm gonna b beside ur car when u cowards come to get it
- . . . I swear to god you guys will pay I promise you [T.H] I haven't got a god dam thing to lose . . .
- So I'm hoping this piece of sh** u thinks worth dying over is worth all that to you

Exs. 41, 43-46, 50, 54.

[7] The jury found Hudnall guilty of Level 5 felony stalking and both counts of invasion of privacy, which were both enhanced to Level 6 felonies after Hudnall stipulated to a prior conviction. The court "[found Hudnall] guilty" as to the stalking count and "enter[ed] a judgment of guilty" as to the invasion-of-privacy counts. Tr. Vol. III p. 209. The following month, the court sentenced Hudnall to six years on the stalking conviction. The court then found that the invasion-of-privacy convictions "merge[d] into [the stalking] conviction since they were invasions of privacy for violating a protective order." *Id.* at 226. However, the court did not vacate the invasion-of-privacy convictions.

[8] Hudnall now appeals.

# Discussion and Decision

## I. Admission of Evidence

[9] Hudnall challenges the trial court's admission of several pieces of evidence. Admission or exclusion of evidence is within the sound discretion of the trial court, and we will reverse such a decision only if the trial court abused that discretion. *Kindred v. State,* 973 N.E.2d 1245, 1252 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic, facts, and circumstances presented. *Id*. We do not reweigh evidence or judge the credibility of witnesses, and we consider conflicting evidence most favorable to the trial court's ruling. *Id*.

## A. *Miranda*

Hudnall first challenges the trial court's admission of Exhibit 2 (body-camera footage of Hudnall's arrest on October 7) and Exhibit 4 (car-camera footage of Hudnall's arrest on November 23) because Hudnall had not been given his *Miranda* rights before any statements made in the footage. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court "held that when law enforcement officers question a person who has been 'taken into custody or otherwise deprived of his freedom of action in any significant way,' the person must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Luna v. State*, 788 N.E.2d 832, 833 (Ind. 2003) (quoting *Miranda*, 384 U.S. at 444). *Miranda* is triggered only if the person was under custodial interrogation. *State v. Ruiz*, 123 N.E.3d 675, 679 (Ind. 2019).

Here, the trial court found Hudnall was not in custody for "the beginning" of Exhibit 2, and thus *Miranda* was not required. Tr. Vol. III p. 15. For an interrogation to be custodial, one does not necessarily have to be under arrest. *C.L.M. v. State,* 874 N.E.2d 386, 390 (Ind. Ct. App. 2007) (citing *A.A. v. State*, 706 N.E.2d 259, 261 (Ind. Ct. App. 1999)). "Custody under *Miranda* occurs when two criteria are met. First, the person's freedom of movement is curtailed to 'the degree associated with a formal arrest.'" *Ruiz*, 123 N.E.3d at 680 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)). Second, "the person undergoes 'the same inherently coercive pressures as the type of station house

questioning at issue in *Miranda*.'" *Ruiz*, 123 N.E.3d at 680 (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).

[12]     Hudnall was not in custody for the first seven-and-a-half minutes of Exhibit 2 (hereinafter "Part I"). In Part I, Hudnall was standing on his front porch in broad daylight speaking with the two officers. Hudnall moved freely around the porch, speaking casually with one of the officers and caring for his son while Sergeant Stahl made a phone call. His movements were not restrained by the officers: he was not handcuffed or told he had to stay on the porch, and although one officer did stay with Hudnall while Sergeant Stahl left to take a phone call, that officer did not block the exit of the porch but instead stood next to Hudnall and chatted with him until Sergeant Stahl returned. This encounter was brief and took place at Hudnall's home, and the officers' questions were casual and information-gathering rather than aggressive or accusatory. *See Ruiz*, 123 N.E.3d at 683 (finding coercive pressure where questioning was "prolonged," took place in an unfamiliar setting, and included accusatory questioning). Hudnall's freedom of movement was not curtailed to the degree associated with a formal arrest, and there were not any "station house" coercive pressures present. There was no error in the admission of Part I.

[13]     However, for the final twenty-four minutes of Exhibit 2 (hereinafter "Part II") and for the entirety of Exhibit 4, there is no dispute Hudnall was in custody, as he was handcuffed, arrested, and placed in the back of a police car. The question then is whether he was interrogated. The State argues, and the trial court found, that Hudnall was not interrogated and instead volunteered any

statements. In contrast, Hudnall argues that during both encounters, officers knew their comments or questions were likely to elicit incriminating responses. However, we need not resolve these issues because any error in the admission of this evidence was harmless.

[14] Statements obtained in violation of *Miranda* and erroneously admitted are subject to harmless-error analysis. *Wright v. State*, 766 N.E.2d 1223, 1231 (Ind. Ct. App. 2002). "To constitute harmless error, the conviction must be 'supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction.'" *Id.* (quoting *Morales v. State*, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001)). Regarding Part II of Exhibit 2, Hudnall identifies two incriminating statements: his threats to kill T.H. and his admission he had been at T.H.'s house on October 7. But these statements were cumulative of other evidence. Body-camera footage of T.H. and Kienzler saying Hudnall threatened to kill her was admitted, as were several threatening text messages Hudnall sent to T.H., such as "I swear to god you guys will pay I promise you [T.H] I haven't got a god dam thing to lose." Ex. 16, 2:14-18; Ex. 50. As for Hudnall's admission he had been at T.H.'s apartment earlier that day, not only did T.H. testify he was there that day, but a neighbor also testified to seeing Hudnall, and Hudnall himself admitted to being there in Part I. Any error in the admission of Part II is harmless.

[15] Regarding Exhibit 4, Hudnall does not point to any specific statements he believed harmed him. Instead, he argues the tape as a whole depicted him "as

an angry, ranting person who was not truthful in his responses to the officers regarding the protective order."[1] Appellant's Br. p. 36. But other pieces of evidence depicted Hudnall in this manner, including: (1) the phone call between Hudnall and Officer Davis on January 3, 2019, in which Hudnall lied, claimed he was not at home (even though officers could see him), and claimed they were seeing his twin brother; (2) the photographs of the excessive and threatening text messages Hudnall sent T.H.; and (3) testimony from T.H. and Kienzler that Hudnall "started going off" on them, including that he was "running his mouth," "screaming," "going crazy," and threatening to kill T.H. Ex. 16, 1:24-2:18.

[16] Because any incriminating statements made by Hudnall were cumulative of other evidence, we conclude there was sufficient independent evidence of his guilt and any error in the admission of Exhibits 2 and 4 was harmless.

## B. Authentication

[17] Hudnall next challenges the trial court's admission of photographs of the call log (Exhibits 33-38) and text messages on T.H.'s cell phone (Exhibits 21-27, 29-

---

[1] Hudnall also argues he made "incriminating statements about the contents of the protective order" in Exhibit 4. Appellant's Reply Br. p. 11. But he does not tell us what these statements were. Instead, he merely cites to portions of the exhibit—4:15 to 4:50 (during which Hudnall does not speak), 6:30 to 6:45 (Hudnall saying he doesn't have a copy of the protective order because he gave his to T.H.), and 7:00 to 7:30 (Officer Davis reading the protective order and Hudnall saying "the judge told us . . ." before getting cut off). Hudnall makes no cogent argument as to how he was harmed by the admission of these portions of the recording.

32, and 39-64).[2] Hudnall argues the photographs were not properly authenticated "as the State did not establish [the calls or text messages] originated with Hudnall" and thus the photographs constituted inadmissible hearsay. Appellant's Br. p. 51. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). "Once this reasonable probability is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility." *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. Authentication of an exhibit can be established by either direct or circumstantial evidence." *Id.* "Evidence that satisfies the requirement" includes "[t]estimony that an item is what it is claimed to be, by a witness with knowledge" and the "contents . . . or other distinctive characteristics of the item[.]" Evid. R. 901(b)(1), (4). "Absolute proof of authenticity is not required." *Fry v. State*, 885 N.E.2d 741, 748 (Ind. Ct. App. 2008), *trans. denied*.

[18]    The challenged exhibits are photographs of text messages and the call log on T.H.'s phone. The text messages all came from the same phone number, and the call log showed over thirty calls from that number to T.H.'s phone in a 24-hour period. Sergeant Stahl testified T.H. said the phone number was

---

[2] The State argues Hudnall did not object to the introduction of Exhibits 39-64 at trial and therefore he has waived the argument on appeal. The record is muddled on this point. *See* Tr. Vol. III pp. 113-115. In any event, the issue of waiver notwithstanding, we hold the exhibits were properly admitted.

Hudnall's. Furthermore, Hudnall "personally confirmed" that was his number to Sergeant Stahl, and a video of Hudnall saying that was his phone number was played to the jury. Tr. Vol. III p. 94; Ex. 2, 7:14. And the content of the text messages displayed in the photographs (Exhibits 21-27 and 39-64) indicates Hudnall sent them. The messages often referred to T.H. by name and referred to their relationship, such as "we could have a great marriage" and calling himself "your husband" and the "dad" of B.H. and C.H. Exs. 29, 32, 55. The messages also referenced the ongoing court cases and the protective order. The testimony of knowledgeable witnesses and the distinctive content of the messages is sufficient to authenticate the photographs of text messages and the call log on T.H.'s phone. *See Rogers v. State*, 130 N.E.3d 626, 630 (Ind. Ct. App. 2019) (holding text messages were properly authenticated based on witness testimony and the personal information relayed in the messages).

[19] Hudnall also argues the photographs were inadmissible hearsay. However, this argument depends upon there being a lack of proof that Hudnall wrote the messages displayed in the photographs. Because there is sufficient evidence to authenticate the messages as having been written by Hudnall, they qualify as non-hearsay statements by a party-opponent. *See* Ind. Evidence Rule 801(d)(2).

[20] We conclude the trial court did not abuse its discretion in admitting the photographs of the call log and text messages.

# II. Mistrial

[21]    Hudnall also asserts the trial court erred in denying his motion for mistrial based on the admission of the recorded phone conversation between Hudnall and Officer Pegan on January 2, 2019, in which Hudnall referenced child-molesting allegations against him.[3] A mistrial is an extreme remedy that should be used only when no other curative measure will rectify the situation. *Moore v. State*, 652 N.E.2d 53, 57 (Ind. 1995), *reh'g denied*. In reviewing the denial of a motion for mistrial, the appellant must establish the questioned conduct was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989). The gravity of the peril is measured by the conduct's probable persuasive effect on the jury, not the degree of impropriety of the conduct. *Id.* The denial of a motion for mistrial rests within the trial court's sound discretion, and we review that decision only for an abuse of discretion. *Brittain v. State*, 68 N.E.3d 611, 619 (Ind. Ct. App. 2017), *trans. denied*. The trial court is entitled to great deference on appeal because it is in the best position to evaluate

---

[3] The State argues Hudnall waived his claim of error by refusing the trial court's offer to admonish the jury. Our Supreme Court has stated "refusal of an offer to admonish the jury constitutes a waiver of any error in the denial of the motion [for mistrial]." *Randolph v. State*, 755 N.E.2d 572, 575 (Ind. 2001); *cf. id.* at 576 (Dickson and Boehm, J.J., concurring in result) (concluding "refusal to accept an admonition waives the issue only if the admonition would cure the problem"). In *Randolph*, the Court, notwithstanding its finding of waiver, addressed the merits of the defendant's claim. *Id.* at 575. Similarly, this Court has noted it may be "particularly prudent" to address the merits of a defendant's claim in cases where, as here, trial counsel declined an offer to admonish the jury by specifically commenting on "the unsavory position of choosing between emphasizing inappropriate testimony to the jury and waiving appellate review of the trial court's denial of a motion for mistrial." *Smith v. State*, 872 N.E.2d 169, 174-75 (Ind. Ct. App. 2007), *trans. denied*. Therefore, regardless of whether Hudnall waived the issue by declining to accept an admonishment, we choose to address the merits of Hudnall's argument.

the relevant circumstances of a given event and its probable impact on the jury. *Id.* at 620.

[22] Specifically, Hudnall asserts "[t]he deputy prosecutor launched an evidentiary harpoon" in the form of the recording which "placed Hudnall in grave peril, as the probable persuasive effect of the misconduct on the jury's decision was substantial and highly prejudicial." Appellant's Br. pp. 43, 45. An evidentiary harpoon refers to placing inadmissible evidence before the jury deliberately to prejudice the jurors against the defendant. *Overstreet v. State*, 877 N.E.2d 144, 154 (Ind. 2007), *reh'g denied*. The injection of an evidentiary harpoon may constitute prosecutorial misconduct requiring a mistrial. *Roberts v. State*, 712 N.E.2d 23, 34 (Ind. Ct. App. 1999), *trans. denied*. To prevail on such a claim, the defendant must show that the prosecution acted deliberately to prejudice the jury and that the evidence was inadmissible. *Id*. A defendant need not prove he would have been acquitted but for the harpooning. *Jewell v. State*, 672 N.E.2d 417, 424 (Ind. Ct. App. 1996), *trans. denied*. However, when the jury's determination is supported by independent evidence of guilt and it was likely the evidentiary harpoon did not play a part in the defendant's conviction, the error is harmless. *Perez v. State*, 728 N.E.2d 234, 237 (Ind. Ct. App. 2000), *trans. denied*.

[23] We agree—and the State does not dispute—the references to child-molesting allegations against Hudnall in the admitted recording were inadmissible. The trial court also seemed to acknowledge as much, noting that had it known about the references beforehand it would have required a redaction of those

references. Nonetheless, we see no evidence in the record that the deputy prosecutor deliberately sought to introduce the recording to prejudice the jury. Instead, the record supports this was a careless oversight. The deputy prosecutor admitted the "error" was caused by him not reviewing the recording or his notes "as sufficiently as [he] thought he had[.]" Tr. Vol. III p. 101. Defense counsel, who did not object to the recording's admission, similarly stated he either "didn't hear" the references during his trial preparation or "forgot" they were included. *Id.* at 76. Notably, the recording's "sound quality was not very good," and Hudnall's words were often difficult to understand. *Id.* at 80. The trial court acknowledged this fact and said it did not notice one of the references and thought it likely the jury did not either. That the State, defense counsel, and trial court at some point missed these references further indicates the recording's admission was an honest mistake. Nothing suggests the prosecutor was specifically intending to elicit this information, and there were no other mentions of the allegations during trial.

[24] Even if this were a deliberate "evidentiary harpoon," the jury's determination here is supported by independent evidence of guilt. Hudnall was charged with stalking and invasion of privacy. During the three-day trial, the State presented testimony from numerous witnesses and introduced over sixty exhibits to support the charges. Witnesses, including T.H. and several law-enforcement officers, testified about multiple violations of the protective order by Hudnall, including:

- August 6, 2018, when Hudnall was seen by officers in a nearby parking lot to get a clear view of T.H.'s apartment;

- October 7, 2018, when Hudnall showed up at T.H.'s apartment with their child, yelled at her, and threw her to the ground;

- November 7, 2018, when FCM Harkness saw Hudnall arguing with T.H. outside her apartment;

- November 23, 2018, when Hudnall was arrested in T.H.'s parking lot;

- January 1, 2019, when Hudnall followed T.H. to her friend's house and then back to her apartment; and

- January 3, 2019, when Hudnall confronted T.H. and her companion at a local tire store.

Many of these incidents were caught on responding officers' body cameras and played for the jury. The State also introduced photographs showing Hudnall's constant phone calls and text messages to T.H., several of which included threats. And T.H. testified Hudnall "scared the pee out of [her]" and she never knew what he was going to do next. *Id.* at 158. Because of this independent evidence of guilt, it was likely that even if the State injected an evidentiary harpoon into the proceedings, it did not play a part in Hudnall's convictions. Any error was therefore harmless. *See Perez*, 728 N.E.2d at 237 (concluding witness testimony that defendant was a convicted felon was an evidentiary harpoon but that the error was harmless because "[n]o reasonable juror would have indulged the proposition that [the defendant] was a convicted felon as the deciding factor in his conviction").

# III. Sufficiency

[25] Hudnall next argues there is insufficient evidence to support his conviction for stalking. When reviewing sufficiency-of-the-evidence claims, we neither reweigh the evidence nor judge the credibility of witnesses. *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). We will only consider the evidence supporting the judgment and any reasonable inferences that can be drawn from the evidence. *Id.* A conviction will be affirmed if there is substantial evidence of probative value to support each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[26] Indiana Code section 35-45-10-1 defines stalking as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Hudnall challenges only whether the State sufficiently proved T.H. actually felt terrorized, frightened, intimidated, or threatened. Specifically, Hudnall argues the record indicates T.H. only once reported "being terrorized, frightened, intimidated, or threatened: on October 7, 2018, when she alleged Hudnall threw her to the ground" and this "one instance" is insufficient to prove stalking. Appellant's Br. p. 55. We disagree.

[27] The record indicates T.H. was actually terrorized, frightened, intimidated, or threatened on multiple occasions by Hudnall's conduct. T.H. not only testified as to several incidents with Hudnall, but the State introduced footage of these incidents from which the jury could reasonably infer T.H. felt terrorized, frightened, intimidated, or threatened. The first, as Hudnall concedes, is the October 7, 2018 incident where Hudnall came to T.H.'s apartment, grabbed her by the hair, and threw her to the ground. T.H. testified this "scared the pee out of [her]," and the body-camera footage provided by the responding officer shows T.H. crying while recounting the assault. Tr. Vol. III p. 158; Ex. 15; 6:18. The following month, officers again arrested Hudnall outside T.H.'s apartment complex. Body-camera footage from a responding officer shows T.H. crying while speaking to him. *See* Ex. 5, 7:20. She later testified she cried because "one minute [Hudnall's] going crazy on her and the next minute he's like perfectly fine" and called Hudnall "[Doctor Jekyll] and Mr. Hyde." Tr. Vol. III p. 161. And T.H. testified she felt fear and called the police in January 2019 after Hudnall confronted her and her companion at a local tire store. This evidence together is sufficient to show T.H. was actually terrorized, frightened, intimidated, or threatened by Hudnall.

[28] Hudnall also argues there was evidence in the record that T.H. was not terrorized, frightened, intimidated, or threatened because she continued to have unsupervised contact with him to co-parent their children and she "socialized at his home[.]" Appellant's Br. p. 56. This is a request to reweigh evidence, which we will not do.

Based on the record, we conclude the State presented sufficient evidence from which the jury could find beyond a reasonable doubt Hudnall committed the offense of stalking.

## IV. Double Jeopardy

Finally, Hudnall argues the trial court erred by merging the invasion-of-privacy convictions with the stalking conviction instead of vacating them, resulting in double jeopardy. The State concedes the trial court erred in this regard, and we agree. "[I]f the trial court does enter judgment of conviction on a jury's guilty verdict, then simply merging the offenses is insufficient and vacation of the offense is required." *Kovats v. State*, 982 N.E.2d 409, 414-15 (Ind. Ct. App. 2013). Here, the trial court entered judgment of conviction on all three counts but simply merged the invasion-of-privacy convictions with the stalking conviction without vacating them. Therefore, we remand this matter to the trial court with instructions to vacate the invasion-of-privacy convictions.

Affirmed in part and reversed and remanded in part.

Bailey, J., and Robb, J., concur.