**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**BRYAN M. TRUITT**
Bertig & Associates LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SCOTT W. NICOL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1311-CR-472 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable William E. Alexa, Judge
Cause No. 64D02-1210-FA-10198

**November 20, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Scott W. Nicol was convicted following a jury trial of two counts of Class A felony child molesting and two counts of Class C felony child molesting.[1] Nicol was ordered to serve an aggregate sentence of eighty-four years executed. On appeal, Nicol raises the following restated issues:

I.      Whether the trial court abused its discretion by admitting two expert witnesses' testimony that Nicol contends constituted impermissible vouching; and

II.     Whether Nicol's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

During the time period from January 1, 2010 until August 1, 2011, Nicol lived in Portage, Indiana, with his girlfriend, K.M., and her three daughters: B.C.M., who was born June 5, 2002; M.A.M., who was born December 17, 2004; and J.M., who was born March 17, 2008. B.C.M. had her own bedroom at the house, while M.A.M. shared a bedroom with J.M. K.M. worked as a card dealer at a local casino where Nicol was a pit boss. K.M. worked from 7:00 p.m. until 3:00 a.m. Occasionally, a babysitter named Sue watched the girls; however, Nicol was the primary babysitter for the girls while K.M. was gone. Around August 1, 2011, K.M. and her daughters left Nicol's home and moved to LaPorte, Indiana. At that time, K.M. began working for a different casino and hired a new babysitter, Sarah, to care for the girls while she worked. It was Sarah who, in March 2012, first learned from

---

[1] *See* Ind. Code §§ 35-42-4-3(a)(1) and -3(b). We note that, effective July 1, 2014, a new version of the child molesting statute was enacted. Because Nicol committed his crimes prior to July 1, 2014, we apply the statute in effect at the time he committed his crimes.

M.A.M. and B.C.M. about events that led to Nicol being charged with having committed one count of Class A felony child molesting and one count of Class C felony child molesting against each of B.C.M. and M.A.M. during the time period when they had lived at Nicol's home.[2]

At trial, M.A.M. testified that, one night while they were living in Nicol's Portage house, Nicol told M.A.M. to sit on the toilet in the bathroom, where the lights were turned off, and he put his penis into her mouth. M.A.M. pulled back, but Nicol told her to "stop pulling away from him." *Tr.* at 148. After Nicol removed his penis from M.A.M.'s mouth, she spit something into the sink that she described as being white in color and warm in temperature. On another occasion, Nicol entered M.A.M.'s bedroom at night, when he thought she was sleeping, and touched and rubbed her "privates" over her pajama pants. *Id*. at 151-52. M.A.M., who was actively cross-examined, conceded that she had previously denied being touched in her "private area," and that she had not told the detective investigating the allegations about the incident in the bathroom. *Id*. at 157, 158, 161, 162. On redirect, M.A.M. testified that Sarah was the first person she told about the "bad things." *Id*. at 170. When the State asked M.A.M. if she had told the truth, she answered simply, "Yeah." *Id*. at 171.

B.C.M. testified that, while living with Nicol in Portage, Nicol entered her bedroom one night and put his fingers inside her vagina. *Id*. at 186, 187. B.C.M., who had previously been asleep, pretended she was still sleeping, but could see Nicol by the light

---

[2] During the period in question, B.C.M. would have been seven to nine years old and M.A.M. would have been five to six years old. Nicol, who was born in January 1959, was at least fifty-one years old.

of her alarm clock. *Id*. at 186, 187, 188, 190. B.C.M. said that Nicol kept his fingers inside of her for five minutes, but that "the pain would last 10 or 15 minutes." *Id*. at 189. Another time, when Nicol thought that B.C.M. was asleep, he went into her bedroom, took off her pants, and "just touch[ed her]" in her "private area." *Id*. at 193, 194. On cross-examination, defense counsel actively questioned the details of B.C.M.'s version of the events, suggesting that this was the first time B.C.M. had mentioned that Nicol used his fingers or that she could see him by the light from her alarm clock. *Id*. at 198. B.C.M., who was close to and trusted her former babysitter, Sue, was questioned as to why she had not told Sue about Nicol's actions. *Id*. Finally, defense counsel asked B.C.M., "You don't always tell the truth, do you," to which B.C.M. responded, "No." *Id*. at 206. Defense counsel then asked B.C.M., if she had lied to her mother before, to which B.C.M. answered, "Yes." *Id*. Finally, defense counsel asked B.C.M. twice, "You lie quite a bit, do you not?" *Id*. B.C.M. simply answered, "I used to." *Id*.

Sarah's testimony followed the testimony of B.C.M. Sarah said that, while babysitting for K.M.'s children, she noted that M.A.M. "had been having some problems." *Id*. at 211. M.A.M., who was seven at the time, "seemed very happy go lucky, but she would wet herself and not say anything about it." *Id*. at 211. One evening in March 2012, after the girls and Sarah had returned from the grocery store, Sarah discovered that M.A.M. had "actually pooped [in] her pants." *Id*. It was then that Sarah told M.A.M. that "if she needed anything or if there was something wrong that she could talk to [Sarah] about it and that's when it came out." *Id*. Although Sarah did not know Nicol, M.A.M. and B.C.M. told Sarah about the things Nicol had done to them. While telling Sarah about Nicol's

4

actions, M.A.M. "was very upset," "crying, tremoring, [and] shaking." *Id*. at 215. B.C.M. was "also very upset," "shaking," and "crying very hard." *Id*. at 216. After their conversation, Sarah noted "it seemed like [M.A.M.] felt so much more relieved. She had calmed down and seemed like there was a weight off her shoulder that [Sarah] didn't even realize was there." *Id*. at 215. After speaking with the girls, Sarah contacted her own mother who was a social worker. Sarah also called K.M. and told her that she believed that B.C.M. and M.A.M. had been sexually molested.

K.M. testified that she returned home from work as soon as she could after Sarah contacted her. Once home, K.M. asked Sarah about her conversation with the girls; what Sarah related made K.M. cry. *Id*. at 225. Because K.M. did not want to wake B.C.M. and M.A.M., she spoke with the girls the next morning, and based on what she learned, K.M. called "the pediatrician and asked the pediatrician what [she] was supposed to do." *Id*. K.M. was told to take B.C.M. to the emergency room to check for physical damage, which she did. Thereafter, Corrie Hicks, a family case manager for the Indiana Department of Child Services ("DCS") in Porter County, contacted K.M., and they arranged to meet.

On March 16, 2012, K.M. took B.C.M., M.A.M., and J.M. with her to meet with Hicks and Detective Janis Regnier of the Portage Police Department. During that meeting, Hicks and Detective Regnier, together, interviewed K.M. and, with K.M.'s permission, interviewed the three girls.[3] At trial, Hicks and Detective Regnier testified regarding the protocol that is followed to forensically interview children of alleged sex abuse. *Id*. at 263,

---

[3] Hicks testified that she has to "meet all children in the household regardless of whether or not they're alleged victims or not. So [she] did see all three girls, and [] did an interview along with Detective Regnier . . . ." *Tr*. at 269.

318. Hicks explained at trial that the protocol goes by an acronym, "RATAC," which stands for rapport, anatomy, touching, action, and conclusion. B.C.M. and M.A.M. were interviewed separately from each other. During those interviews, Hicks and Detective Regnier followed the RATAC protocol by building a rapport with the girls, going over the parts of the body, discussing good touches and bad touches, asking about any actions that happened to the girls, and concluding the interview. Detective Regnier explained that the purpose of the interview is to determine "[w]hether or not a crime has been committed," and to "determine the validity of the report that had been received." *Id*. at 317, 318. Defense counsel conceded that he failed to object to the former statement, but objected to the latter statement on the basis that it is vouching to say that "the purpose of the interview is to determine the validity of the allegations." *Id*. at 319. The trial court overruled the objection.

M.A.M., who was interviewed first, was seven years old at the time of the interview. While identifying the parts of the body on an anatomical diagram of a preschool-aged girl and another of a preschool-aged boy, Hicks noted that M.A.M. "was very quiet, appeared very shy[,] . . . was kind of hunched over, [and] very soft spoken." *Id*. at 275-76. Hicks testified that, under Detective Regnier's lead questioning, M.A.M. was able to identify most body parts, however, she was reserved when asked to identify the penis and the vaginal area. Throughout Detective Regnier's interview, M.A.M. "continued to deny any sort of touching . . . ." *Id*. at 277. Hicks then took the lead in the interview. Following protocol, Hicks asked M.A.M. who she would tell if she was ever touched. It was at that time that M.A.M. disclosed she had been touched. *Id*. at 278. When Hicks asked where

6

M.A.M. had been touched, M.A.M. pointed to and circled the vaginal area on the diagram. *Id.* Over defendant's continuing hearsay objection, the trial court allowed Hicks to relate M.A.M.'s statements that Nicol was the one who touched her and the details of those touches. *Id.* at 280-83. Hicks finally explained, "We also kind of praise the child that she did a very good job in going through all this even though it was hard for her because you could tell just from her demeanor that she was having a difficult time." *Id.* at 284-85. On cross-examination, Hicks confirmed that when M.A.M. was asked, "Did it happen anywhere else in the bedroom or other than in your bedroom," M.A.M. responded, "No, only in my bedroom." *Id.* at 310.

B.C.M. was "very open" during her interview and even corrected Hicks and Detective Regnier as they "follow[ed] the same steps in [their] interviewing protocol." *Id.* at 287. Similar to the questioning of M.A.M., Hicks discussed body part names with B.C.M. to makes sure that everyone in the interview used the same terms. *Id.* at 288. After B.C.M. provided details of Nicol's alleged actions, Hicks went back through some of the details for clarification. *Id.* at 289. The State then questioned Hicks regarding knowledge she had obtained as a result of experience and training, specifically with regard to child abuse cases. *Id.* at 293-97. Finally, the State asked Hicks why the time between the date of alleged conduct and the date of disclosure was not important to the investigation. *Id.* at 298. Hicks responded "Because what I am looking at is what occurred, not when it occurred. That is more important." *Id.* Nicol's counsel confirmed with Hicks that she had interviewed K.M., B.C.M., and M.A.M. on March 16, 2012, had interviewed Nicol on May 7, 2012, but that she had done no other interviews regarding the allegations. *Id.* at 302.

7

Nicol noted that, during the period in question, the girls had also spent time visiting their father and had been in the company of other men, but that Hicks had not questioned anyone other than Nicol. *Id.* at 306-08. Detective Regnier specifically asked B.C.M., "In your privates was it ever with [Nicol's] hands," to which B.C.M. said, no. *Id.* at 310.

Nicol testified at trial and stated that he had not done any of the things that he had been accused of doing to B.C.M. and M.A.M. Nicol explained that he had started dating K.M. in 2008, and because finances were tight, K.M. and her children had moved in with Nicol by January 1, 2010. Nicol stated that, while the family was in Portage, he cared for the girls, played board games with them, and would take them grocery shopping. He testified that B.C.M. was "pretty tough to control," and she broke the rules set by her mother. *Id.* at 354, 355. Nicol suggested that B.C.M.'s lying "was an ongoing thing." *Id.* at 356. When questioned why the girls would make up the stories, Nicol answered that he thought it stemmed from their father, because, "[i]f something actually happened to these girls, it happened there, not with me." *Id.* at 362. He further testified that he thought the girls were being molested by their father. Nicol said that he discussed his suspicions with K.M. "[m]any, many times," but that K.M. took no action, and he did not believe that it was his responsibility to contact the police. *Id.* at 362-63. Following Nicol's testimony, six other witnesses testified on his behalf, stating that Nicol had a good reputation in the community for truthfulness and honesty.

The jury found Nicol guilty of all four counts. During the sentencing hearing, the trial court considered Nicol's pre-sentence investigation report ("PSI report"), the addendum to his PSI report, the sentencing memorandum filed by each party, as well as

8

the letters written on his behalf. *Sentencing Tr.* at 4, 12. The trial court noted that the sentencing range for a Class A felony is twenty to fifty years, while the sentencing range for a Class C felony is two to eight years, and that based on the jury verdict, the PSI report, and Indiana statutes, the sentences could all be consecutive to each other. *Id.* at 5. The State argued that, as an aggravator, Nicol had violated a position of trust with B.C.M. and M.A.M. Nicol asked the trial court to consider the "fine letters that ha[d] been written on his behalf." *Id.* at 12. Additionally, Nicol noted that he was fifty-four years old and had never been arrested for anything. That being said, Nicol asked for the trial court's consideration to sentence him to "the minimum possible penalty in the case." *Id.* The trial court noted that the advisory sentence for each Class A conviction was thirty years, that Nicol's lack of criminal record reduced that sentence to twenty years, but that the aggravators of the children's young age and the fact that Nicol violated a position of trust, warranted a forty-year sentence for each Class A felony conviction, which was to be served consecutively. As to the Class C felony convictions, the trial court sentenced Nicol to four years for each of the two counts to run concurrent with each other, but consecutive to the Class A felony sentences, for a total executed sentence of eighty-four years. Nicol now appeals.

## DISCUSSION AND DECISION

### I.      Vouching Testimony

Nicol contends that the testimony of Hicks and Detective Regnier amounted to impermissible vouching testimony regarding the credibility of B.C.M. and M.A.M. Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions

9

concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." "This testimony is considered to be an 'invasion of the province of the jurors in determining what weight they should place upon a witness's testimony.'" *Palilonis v. State*, 970 N.E.2d 713, 729 (Ind. Ct. App. 2012) (quoting *Gutierrez v. State,* 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012)), *trans. denied.*

The admissibility of evidence is within the sound discretion of the trial court, and we will disturb its rulings only where it is shown that the court abused that discretion. *Hoglund v. State,* 962 N.E.2d 1230 (Ind. 2012); *Robey v. State*, 7 N.E.3d 371, 379 (Ind. Ct. App. 2014), *trans. denied.* An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Robey*, 7 N.E.3d at 379. Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party. *Hoglund,* 962 N.E.2d at 1238. "In viewing the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable impact on the fact finder." *Id.* The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

Nicol contends that Hicks vouched for the credibility of B.C.M. and M.A.M. when she explained that, when interviewing children, she is looking for "validity." *Tr.* at 263. Hicks also noted the methods she uses to interview children, explaining that she looks to see "how valid they are in their story telling, about how detailed they are, how consistent

their story is, how reliable they appear. I look for body language." *Id*. Hicks testified that, at the end of the interview, "[I]f there is some sort of allegation of the possibility of the incident happening where the child appeared to be credible, I create a safety plan with the parent to ensure that the child is safe." *Id*. at 265. Later, Hicks confirmed that she created a safety plan in the present case. *Id*. at 286. Finally, referring to M.A.M., Hicks testified, "We also kind of praise the child that she did a very good job in going through all this even though it was hard for her because you could tell just from her demeanor that she was having a difficult time." *Id*. at 284-85.

Regarding the testimony of Detective Regnier, Nicol argues that she vouched for the girls' credibility by stating that police become involved in a case to determine "[w]hether or not a crime has been committed." *Id*. at 317. Additionally, once a report is filed, the investigation proceeds to "determine the validity of the report that had been received." *Id*. at 318. Detective Regnier testified that during the interview she looks at the child's demeanor, how they interact with those asking the questions, and whether their story is consistent with the prior allegations.[4] *Id*. at 330.

Here, none of the experts' statements explicitly stated that they believed the girls were telling the truth. It is arguable, however, that some of these statements by Hicks and Detective Regnier could amount to the type of indirect vouching that our Supreme Court held inadmissible in *Hoglund*. *See Kindred v. State*, 973 N.E.2d 1245, 1258 (Ind. Ct. App. 2012) (holding opinions regarding whether child victim was "coached," "truthful,"

---

[4] In his brief, Nicol states, "Regnier was able to testify what she looks for in honesty." *Appellant's Br*. at 10 (citing *Tr*. at 329). While Nicol cites to the transcript, page 329, as support for this statement, we do not find the word honesty on or around that page.

11

"believable," and "wouldn't lie" constituted vouching prohibited by *Hoglund*), *trans. denied*. Assuming without deciding that Nicol properly objected to each statement and those statements constituted inadmissible vouching, the admission of the testimony was harmless.

Citing to the harm caused by the vouching testimony of Hicks and Detective Regnier, Nicol notes that his convictions rested solely on the credibility of the girls. *Appellant's Br*. at 12. Nicol asserts that the State presented no forensic evidence or evidence of an independent eyewitness to the crimes and that the girls' accusations spanned a twenty-month period. *Id*. Additionally, Nicol argues, "There are numerous other (likely) people in [the girls'] lives that could have molested them (if they were molested)." *Id*. at 11-12. Nicol concludes that the vouching testimony of the two experts, therefore, "carried the day." *Id*. at 12.

As support for his position, Nicol cites to our Supreme Court's decision in *Traver v. State*, 568 N.E.2d 1009 (Ind. Ct. App. 1991).[5] There, our Supreme Court reviewed Traver's convictions for two counts of child molesting, against two children, and one count of incest. The evidence admitted at trial consisted primarily of videotaped interviews with each child. During trial, social workers, teachers, physicians, and foster parents repeated the children's hearsay statements. Although the children testified at trial, their statements could not be cross-examined because the children "neither acknowledged giving the statements nor offered in-court testimony about the charges" against Traver. *Traver*, 568

---

[5] We note that *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991) overruled the confrontation clause analysis in *Traver* to the extent that analysis was in conflict with *Modesitt*. However, that does not affect our decision today.

12

N.E.2d at 1011. Reasoning as follows, our Supreme Court found that it was error for the trial court to admit the videotapes into evidence and that the error was not harmless.

> The sum of the adults' hearsay testimony and A.G.'s videotaped *Patterson* statement was much greater than the child's live in-court testimony. The hearsay statements were not merely cumulative, because there is a substantial likelihood that the repetition of the hearsay through adult testimony unfairly and prejudicially created the impression that the adult witnesses were vouching for the credibility of the child. The evidence against Traver was a product of the accusations made by A.G. We must conclude that the admission of hearsay repeating those accusations was prejudicial error.

*Id*. at 1013-14.

*Traver* is distinguishable from this case. Like in *Traver*, the issue at the core of Nicol's conviction was the credibility of B.C.M. and M.A.M. However, unlike in *Traver*, the girls testified extensively and offered in-court testimony regarding what Nicol had done to them. In his cross-examination, Nicol questioned why it took the girls so long to report the incidents and why they did not previously tell their mother or Sue, their trusted former babysitter. Nicol also directly questioned B.C.M.'s credibility by getting her to admit that she does not always tell the truth and that she had lied to her mother in the past. *Tr*. at 206.

The testimony supporting the girls' allegations came not only from B.C.M. and M.A.M., but also from their babysitter Sarah and their mother. Sarah testified that M.A.M., who was around five or six years old, was having accidents in her pants but failed to tell Sarah about it. Finally, M.A.M. and B.C.M. both told Sarah what Nicol had done to them. As the girls related the information, M.A.M. "was very upset," "crying, tremoring, [and] shaking," and B.C.M. was "also very upset," "shaking," and "crying very hard." *Id*. at 215, 216. After their conversation, Sarah noted "it seemed like [M.A.M.] calmed down and

13

seemed like there was a weight off her shoulders that [Sarah] didn't even realize was there." *Id*. at 215. Sarah, who did not know Nicol, called her mother who was a social worker and then called K.M. at work.

K.M. testified that she learned of the girls allegations through Sarah and got home from work as quickly as she could. K.M. testified that what Sarah related made K.M. cry. In response to the information she learned from B.C.M. and M.A.M., K.M. called "the pediatrician and asked the pediatrician what [she] was supposed to do." *Id*. at 225. K.M. was told to take B.C.M. to the emergency room to check for physical damage, which she did. Thereafter, K.M. met with Hicks and Detective Regnier.

During his testimony, Nicol admitted that he cared for the girls and played board games with them, but he denied having inappropriately touched either B.C.M. or M.A.M. Nicol maintained that B.C.M. was "pretty tough to control," and she broke the rules set by her mother. *Id*. at 354, 355. He also suggested that B.C.M.'s lying "was an ongoing thing." *Id*. at 356. When questioned why the girls would make up the stories, Nicol answered that he thought it stemmed from their father, because, "[i]f something actually happened to these girls, it happened there, not with me." *Id*. at 362. He further testified that he thought the girls were being molested by their father, and said that he discussed his suspicions with K.M. on numerous occasions, but that K.M. took no action. *Id*. at 362-63. Six witnesses testified on Nicol's behalf, stating that he had a good reputation in the community for truthfulness and honesty.

Here, the girls' credibility was at issue. Through his testimony and the testimony of his witnesses, Nicol also placed his own credibility very much as issue. By raising his

theory that he thought the girls' father was molesting the girls, and by highlighting portions of the girls' stories that he claimed were inconsistent, Nicol provided a scenario to allow the jury to believe both that the girls had been molested and that Nicol was not guilty of those crimes. Based on the testimony as a whole, the jury chose to believe B.C.M. and M.A.M. Assuming without deciding that the trial court abused its discretion in allowing into evidence the statements of Hicks and Detective Regnier that Nicol contends constituted vouching, that error was harmless. We find no substantial likelihood that the challenged evidence contributed to Nicol's convictions.

## II. Inappropriate Sentence

Nicol also contends that his eighty-four-year sentence is inappropriate pursuant to Indiana Appellate Rule 7(B). That rule states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Appellate Rule 7(B) analysis is not to determine 'whether another sentence is more appropriate' but rather 'whether the sentence imposed is inappropriate.'" *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (quoting *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)). When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Nicol has the burden to show that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

We observe that "the advisory sentence is the starting point the Legislature selected

15

as appropriate for the crime committed." *Pierce v. State*, 949 N.E .2d 349, 352 (Ind. 2011). "A person who commits a Class A felony (for a crime committed before July 1, 2014) shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the *advisory sentence* being thirty (30) years." Ind. Code § 35-50-2-4 (emphasis added). The trial court enhanced Nicol's sentence to forty years for each Class A felony conviction on the basis that: (1) Nicol had violated a position of trust with M.A.M. and B.C.M.; and (2) the girls were significantly younger than fourteen years of age when the incidents occurred.

Nicol contends that, notwithstanding the trial court's findings, his sentence was inappropriate in light of his character. He was fifty-one or fifty-two years old at the time the offenses were committed, and fifty-five years old at the time of sentencing. Prior to his convictions, Nicol was a productive member of society; he had been steadily and gainfully employed for the fifteen years prior to his arrest and worked for "$30.00 per hour as a pit boss/floor manager" for a casino. *Appellant's Br*. at 4. Nicol has two adult children, has the support of his family and friends, and, prior to the instant offenses, had no criminal history. In fact, Nicol had never even been accused of committing a crime. Nicol has no substance abuse issues or mental health disorders.

This court is charged with leavening the outliers in sentencing. We affirm Nicol's convictions. However, after due consideration of the trial court's decision, we find that Nicol's eighty-four year sentence is inappropriate in light of the nature of the offense and the character of the offender. Accordingly, we vacate Nicol's sentence and remand to the trial court with instructions to re-sentence Nicol to forty-four years, which shall be made up of forty years for each of his Class A felony convictions, to be served concurrent with

16

each other, and four years for each of his Class C felony convictions, also to be served concurrent with each other but consecutive to the sentences for the Class A felony convictions.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and ROBB, J., concur.