


FILED

Mar 19 2025, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## IN THE

# Court of Appeals of Indiana

Gary D. Bolcerek,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 19, 2025

Court of Appeals Case No.
24A-CR-2232

Appeal from the Porter Superior Court

The Honorable Michael A. Fish, Judge

Trial Court Cause No.
64D01-2206-F2-5060

---

**Opinion by Judge Mathias**
Judges Foley and Felix concur.

**Mathias, Judge.**

Gary D. Bolcerek appeals his convictions for Level 2 felony burglary, Level 5 felony criminal recklessness, Level 5 felony battery, Level 5 felony intimidation, Level 6 felony battery, Level 6 felony strangulation, and Level 6 felony pointing of a firearm. Bolcerek also appeals his aggregate sentence of twenty-six years in the Department of Correction. Bolcerek raises three issues for our review, which we restate as follows:

1. Whether the trial court committed fundamental error in the admission of evidence.

2. Whether Bolcerek's convictions are contrary to Indiana's protection against substantive double jeopardy.

3. Whether Bolcerek's aggregate sentence is inappropriate in light of the nature of the offenses and his character.

We hold that the trial court properly abstained from interjecting itself on Bolcerek's behalf during the State's case-in-chief, and, had the court done otherwise as Bolcerek now argues under the fundamental error doctrine, it would have jeopardized, not protected, Bolcerek's right to a fair trial. We also hold that Bolcerek's several convictions do not violate Indiana's substantive protection against double jeopardy, save for his conviction for Level 6 felony battery, which the State concedes on appeal is contrary to law. But Bolcerek's aggregate twenty-six year sentence remains unchanged, and we affirm that sentence.

## Facts and Procedural History

[3] Bolcerek is married to Cheryl Bolcerek. William Byrge, who lives in Chesterton, is Cheryl's brother. On June 10, 2022, Byrge called Cheryl at her workplace. Cheryl "yell[ed] at him" to not "bother me at work." Tr. Vol. 3, p. 39. She then hung up on him. During her lunch break, Cheryl called Bolcerek and told him that Byrge "was calling and irritating" her. *Id.* at 40.

[4] Shortly after that conversation, Bolcerek went to Byrge's apartment, "bust[ed] in the door," and "pinned [Byrge] to [the] chair" in which he had been sitting. Tr. Vol. 2, p. 222. Bolcerek had a black handgun, and, as Bolcerek held Byrge down with one hand on Byrge's neck, he repeatedly hit Byrge across the head with the handgun in the other hand. Byrge was only "[b]arely" able to breathe and lost consciousness "for a few seconds." *Id.* at 225. At some point, Bolcerek "pushed" the barrel of the handgun "into [Byrge's] eye," and Byrge felt like his "eye was coming out of the socket." *Id.* at 227.

[5] The attack lasted three to five minutes. At the end of it, Bolcerek fired a round above Byrge's head and into his apartment wall, and he told Byrge, "I really want to kill you" but "I can't because of your sister." *Id.* at 228. As he left the apartment, Bolcerek told Byrge not to tell anyone about the attack and that, if Bolcerek ended up in jail, he would kill Byrge. Bolcerek also fired a round through the windshield of Byrge's truck.

[6] After Bolcerek had left the scene, Byrge called 9-1-1. Tommy Horton, one of Byrge's neighbors, heard the commotion in Byrge's apartment; heard Byrge

saying, "[n]o[,] stop"; witnessed Bolcerek exit Byrge's apartment; and witnessed Bolcerek fire the round through the truck's windshield. Tr. Vol. 3, p. 17. Horton also observed Byrge's injuries, including "[l]ots of blood on his forehead." *Id.* at 24. At a local hospital, Byrge informed investigating officers that Bolcerek had attacked him.

[7] Around 3:00 p.m., Chesterton Police Department officers arrived at Bolcerek's residence. Officers knocked on the door, and Bolcerek's nine-year-old daughter answered. They asked if she could get her father, which she did. But, when Bolcerek came to the door, he told the officers to "get off of his property" and "shut the door" on them. *Id.* at 66. A one-hour standoff ensued, with officers eventually calling in a SWAT team. However, Bolcerek surrendered before the SWAT team entered his residence.

[8] Officers later executed a search warrant for Bolcerek's residence. Inside, they found a black handgun with a broken trigger guard. Forensic testing later determined that a shell casing recovered from inside Byrge's residence had been fired from the handgun seized from Bolcerek's residence. Officers also found a piece of a broken trigger guard inside Byrge's residence.

[9] The State charged Bolcerek with Level 2 felony burglary, Level 5 felony criminal recklessness, Level 5 felony battery, Level 5 felony intimidation, Level 6 felony battery, Level 6 felony strangulation, and Level 6 felony pointing of a firearm. In particular, the State's charges read as follows, omitting formal elements:

- For Count 1, Level 2 felony burglary:

  on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did knowingly or intentionally break and enter the building and structure of another person, to wit: Warren Byrge's residential home . . . with the intent to commit a felony or theft therein, and the offense was committed while armed with a deadly weapon, to wit: Gary Bolcerek entered the home of Warren Byrge while armed with a handgun and threatened to kill Warren and pistol whipped Warren causing moderate bodily injury . . . .

Appellant's App. Vol. 2, p. 21.

- For Count 2, Level 5 felony criminal recklessness:

  on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did recklessly, knowingly or intentionally p[er]form an act that creates a substantial risk of bodily injury to another person and the act [wa]s committed by shooting a firearm into an inhabited dwelling or other building or place where people are likely to gather, to wit: Gary Bolcerek entered the home of Warren Byrge [and,] while armed with a handgun[,] fired the handgun into an interior wall of Warr[e]n's residence . . . .

*Id.*

- For Count 3, Level 5 felony battery:

  on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did knowingly or intentionally touch Warren Byrge in a rude, insolent, or angry manner while Gary Bolcerek was armed with a deadly weapon, to wit: Gary

Bolcerek entered the home of Warren Byrge while armed with a handgun and pistol whipped Warren causing open wounds and bruising to Warren's head and face . . . .

*Id.* at 22.

- For Count 4, Level 5 felony intimidation:

  on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did communicate a threat with the intent that another person be placed in fear that the threat will be carried out and the threat is to commit a forcible felony and Gary Bolcerek used or dre[w] a deadly weapon during the communication of the threat, to wit: Gary Bolcerek entered the home of Warren Byrge while armed with a handgun, pointed the handgun into Warren's face, and threatened to kill Warren if he called the police . . . .

*Id.*

- For Count 5, Level 6 felony battery:

  on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did knowingly or intentionally touch Warren Byrge in a rude, insolent, or angry manner and said touching resulted in moderate bodily injury to Warren Byrge, to wit: Gary Bolcerek entered the home of Warren Byrge while armed with a handgun and pistol whipped Warren causing open wounds, pain, and bruising to Warren's head and face . . . .

*Id.*

- For Count 6, Level 6 felony strangulation:

on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did knowingly or intentionally appl[y] pressure to the throat or neck of Warren Byrge in a rude, insolent, or angry manner, to wit: Gary Bolcerek entered the home of Warren Byrge and placed his hands around the throat/neck of Warren Byrge and restrict[ed] Warren's airway . . . .

*Id.*

- For Count 7, Level 6 felony pointing of a firearm:

  on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did knowingly or intentionally point[] a loaded firearm at Warren Byrge, to wit: Gary Bolcerek entered the home of Warren Byrge [and,] while armed with a handgun[,] pointed [the] handgun into Warren's face. Gary also fired a shot into Warren's residence during this encounter indicating that the firearm was loaded . . . .

*Id.* at 23.

[10]     At Bolcerek's ensuing jury trial, Byrge, Horton, and Cheryl each testified for the State. A fourth witness, Bolcerek's neighbor, also testified to having seen Bolcerek exit his truck at his house with a black handgun and acting "[e]xtremely agitated" about one hour before officers arrived on the afternoon of June 10. Tr. Vol. 3, p. 55. Several officers testified as to the evidence seized from the two residences, and three State Lab examiners testified about the nature of certain evidence.

[11]     The State also called Chesterton Police Department Officer Alexias Dejesus. Officer Dejesus testified to meeting Byrge at the hospital and to Byrge's apparent injuries. She also testified to various items of evidence seized from the two residences. Further, she briefly noted, without objection, that officers had an "encounter" with Bolcerek at his residence before they were able to speak with Bolcerek, noting that the officers at the scene thought it prudent to "find cover" until the situation was resolved. *Id.* at 66-67. After Dejesus's testimony, the State called Chesterton Police Department Officer Antonio Alfaro, Porter County Sheriff's Department Officer Jason Praschak, and Chesterton Police Department Chief of Police Timothy Richardson. Each of those witnesses testified at length, and, again, without objection, to the standoff at Bolcerek's residence, the mindset of the responding officers at the scene, and the perceived need for a SWAT response.

[12]     Bolcerek testified in his defense. He described his relationship with Byrge as "[s]ketchy at best" and "[n]ot all that great." Tr. Vol. 4, p. 29. According to Bolcerek, he was working a job near Byrge's apartment when Byrge drove past and said something about Bolcerek's daughter. Byrge's comment "bothered" Bolcerek, and so Bolcerek went over to Byrge's apartment "to talk to him" about it. *Id.* at 33-34. Bolcerek admitted that he went into Byrge's apartment armed but stated that he had placed the handgun down on a folding table, and he then calmly informed Byrge that he did not "appreciate" Byrge's "rude" comments. *Id.* at 35-36. Only then, according to Bolcerek, did Byrge grab the gun, which resulted in Bolcerek and Byrge "wrestl[ing]" to the ground and the

gun discharging a round. *Id.* at 36. After about twenty seconds, Byrge tried to stand up, but he hit his head on the corner of a table and cut himself. Bolcerek then left the apartment. Bolcerek denied strangling Byrge, striking Byrge, and pointing a firearm at Byrge.

[13] During his testimony, Bolcerek expressly responded to the testimony from the various officers about the standoff at his residence. Specifically, Bolcerek testified as follows:

> Q [by defense counsel:] Okay. And we've heard from the other officers as well as [the] chief that it took a[ ]while for you to finally come out of the residence[,] correct?
>
> A.   Yes.
>
> Q.   All right. What was your motivation for not coming out?
>
> A.   Well, I had my daughter there and she was nine years old and I wasn't going to send my daughter out to a bunch of men with guns; she was already upset and crying and I didn't want to—yeah.
>
> Q.   I think we heard that finally—did you ever reach out to Cheryl?
>
> A.   Yeah . . . I called her. Yeah.
>
> * * *
>
> Q.   And you wanted her to come home?

A. Yeah. I told her please get home, there's a lot going on.

Q. Okay. Finally Cheryl did get there[,] right?

A. She did. She left work immediately and headed straight there.

Q. All right. And when she got there, [your daughter] left the residence?

A. Immediately[.] I sent her out to her mother. When I could see Cheryl there, yeah, I sent her directly to her mom. I said go straight to your mom.

Q. Okay. All right. And then how much longer after that did you come out?

A. It was about ten minutes. I told [the] officer or chief that I'd like to smoke a cigarette and relax a little bit. He was fine with that.

*Id.* at 43-44.

[14] The jury found Bolcerek guilty as charged, and the trial court entered judgment of conviction against Bolcerek on each count. Following a sentencing hearing, the trial court identified the following aggravating and mitigating circumstances:

This is a senseless home invasion case. . . . [Y]our version of the facts [is] that you're essentially trying to protect your daughter. And the cruel irony here is you['re] intending to defend your daughter from future harm but your plan is so misplaced that

now you're going to be in prison until your daughter is a young adult.

During the investigation, in light of the police[] during [sic] the trial, I believe you lied to the jury. You apologize today and I'm not sure to whom, but we'll certainly identify that as some level of remorse or contrition.

. . . I will adopt the mitigator that the long period of incarceration would work a substantial hardship on your depend[e]nts. . . .

You are a person with a significant criminal history. I read from the presentence investigation [report] that apparently you like to beat people up. You recently violated the terms of your pretrial release by engaging in criminal misconduct for those other pending matters that I have before me and in the pending case in Illinois. You threatened harm to the victim here, Mr. Byrge. . . .

*Id.* at 137-38. The court then sentenced Bolcerek to an aggregate sentence of twenty-six years in the Department of Correction.

[15]    This appeal ensued.

## 1. The trial court properly abstained from stepping into defense counsel's shoes during the State's case-in-chief.

[16]    On appeal, Bolcerek first contends that the trial court erroneously allowed the State to solicit testimony from several officers about the one-hour standoff outside of Bolcerek's house. According to Bolcerek, had his trial counsel objected to the officers' testimony, a reasonable trial court may have excluded the evidence under Indiana Evidence Rules 402 (irrelevant evidence), 403

(evidence that creates a substantial risk of unfair prejudice), or 404(b) (inadmissible character evidence).

[17]     Bolcerek's counsel did not lodge any such objections during the trial. Accordingly, Bolcerek must demonstrate fundamental error on appeal. As we have explained:

> Fundamental error is an essential safety-valve doctrine that permits appellate courts to order relief due to an undeniable and substantial error that unfortunately slipped past the trial court; it is not a doctrine that exists to simply give appellants a chance to argue that some unpreserved error should nonetheless be reviewable on direct appeal.

*Willoughby v. State*, 244 N.E.3d 473, 476 (Ind. Ct. App. 2024), *trans. denied*.

[18]     Indeed, to demonstrate fundamental error, an appellant must show that the alleged error "made a fair trial *impossible* or constituted a clearly blatant violation of *basic and elementary principles of due process* presenting an undeniable and substantial potential for harm." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) (emphases added; quotation marks omitted). Fundamental error is "extremely narrow" and "encompasses only errors so blatant that *the trial judge should have acted independently* to correct the situation." *Id.* (emphasis added; quotation marks omitted). Further, if the trial judge "could recognize a viable reason why an effective attorney might not object, the error is not blatant enough to constitute fundamental error." *Id.* (quotation marks omitted).

[19]     As we summarized in *Willoughby*:

if the trial court can imagine *any* viable reason for defense counsel to not object or otherwise to proceed in a certain manner at trial, the trial court has no obligation under the fundamental error doctrine to interject itself into the proceedings on the defendant's behalf. Indeed, to do so would *jeopardize* fundamental due process, not protect it, by asking our trial courts to cease being impartial. The *actual* reasonableness of defense counsel's decision-making and any resulting prejudice from unreasonable actions or omissions of counsel are questions best left to the post-conviction process, where a record of counsel's thought-process may be properly developed and assessed; attempting to assess any such thought-process on a silent direct-appeal record under the fundamental error doctrine is outside the scope of that doctrine.

244 N.E.3d at 475.

[20]   Because of those essential concerns underlying the doctrine of fundamental error, our Supreme Court has expressly limited the doctrine's reach in claims of allegedly improper evidence:

improperly seized evidence is frequently highly relevant, [and] its admission ordinarily does not cause us to question guilt. That is the case here. The only basis for questioning [the defendant's] conviction lies not in doubt as to whether [he] committed these crimes[] but rather in a challenge to the integrity of the judicial process. . . . Here, *there is no claim of fabrication of evidence or willful malfeasance on the part of the investigating officers and no contention that the evidence is not what it appears to be. In short, the claimed error does not rise to the level of fundamental error.*

*Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (emphasis added).

[21] Relying on *Brown*, *Durden*, and the wealth of case law consistent with them, we have repeatedly held that relief on claims of fundamental error in evidentiary matters "is especially rare." *Merritt v. State*, 99 N.E.3d 706, 709 (Ind. Ct. App. 2018), *trans. denied*. We have held that no fundamental error existed with respect to "[a]n attorney's decision not to object to certain evidence or lines of questioning" because those decisions are "often . . . tactical . . . , and our trial courts can readily imagine any number of viable reasons why attorneys might not object." *Nix v. State*, 158 N.E.3d 795, 801 (Ind. Ct. App. 2020), *trans. denied*. We have similarly held that no fundamental error existed in an attorney's failure to request an admonishment because "[t]he risk calculus inherent in a request for an admonishment is an assessment that is nearly always best made by the parties and their attorneys and not *sua sponte* by our trial courts." *Merritt*, 99 N.E.3d at 710. Decisions where multiple viable paths forward exist may or may not create Sixth Amendment issues with respect to effective counsel, but they do not result in Fifth Amendment process issues. *Willoughby*, 244 N.E.3d at 477 (citing *Durden*, 99 N.E.3d at 652); *see also Nix*, 158 N.E.3d at 802. Stated another way, review for fundamental error does not permit second-guessing of what, in the moment, could have been seen as a viable decision; rather, it demands the judiciary interject itself to avoid only an obvious and blatant violation of due process. *See Durden*, 99 N.E.3d at 652.

[22] Here, Bolcerek does not argue on appeal that the standoff evidence was in some way "not what it appear[ed] to be." *Brown*, 929 N.E.2d at 207. Rather, his argument is simply that the admission of that evidence implicated his due-

process rights by presenting what might have been inadmissible evidence to the jury. But accepting Bolcerek's argument "would turn fundamental error from a rare exception to the general rule for appellate review," which we will not do. *Nix*, 158 N.E.3d at 802. As our case law makes clear, there are often tactical reasons for attorneys to not object to the admission of evidence, and the fundamental error doctrine does not oblige our trial courts to guess the mind of counsel. *See id.* Bolcerek has therefore not met his burden on appeal to demonstrate fundamental error in the admission of the standoff evidence.

[23] Indeed, the instant appeal exemplifies the wisdom of our Supreme Court's precedents here. Bolcerek's fundamental error argument regarding the standoff evidence is an assertion that the trial court should have interjected itself to protect Bolcerek from his own counsel's alleged failures during the State's case-in-chief. But it is clear from this record that Bolcerek's counsel may well have had a strategy in mind when he did not object to that evidence. *After* the State's case-in-chief, Bolcerek testified in his own defense that his confrontation with Byrge followed Byrge making rude comments about Bolcerek's minor daughter. And Bolcerek explicitly discussed the standoff, saying that it lasted as long as it did because he refused to send his daughter out of the house to armed men and instead waited for Cheryl to arrive.

[24] That is, Bolcerek affirmatively *used* the standoff evidence in his own defense to further his narrative that he was, at all times, being a protective father. Had the trial court interjected itself during the State's case-in-chief as Bolcerek now asserts due process required the court to do, the court would have improperly

interfered with defense counsel's apparent strategic decisions and undermined Bolcerek's right to a fair trial, not protected it. *See Willoughby*, 244 N.E.3d at 475. Indeed, the limitations on fundamental error articulated by our Supreme Court in *Brown*, *Durden*, and like cases *required* the trial court here to maintain its role as an impartial adjudicator and to let the trial play out without the court's improper interference. Consistent with those precedents, the trial court therefore correctly abstained from interjecting itself on Bolcerek's apparent behalf during the State's case-in-chief.

[25] Still, Bolcerek suggests that our understanding of fundamental error is improperly narrow. In support of his position, he relies on two opinions from our Court in which we held that the cumulative effect of vouching testimony and other inadmissible evidence resulted in fundamental error. Reply Br. at 7 (citing *Bean v. State*, 15 N.E.3d 12, 22-23 (Ind. Ct. App. 2014), *trans. denied*; *Kindred v. State*, 973 N.E.2d 1245, 1258-59 (Ind. Ct. App. 2012), *trans. denied*, *abrogated in part on other grounds by Sampson v. State*, 38 N.E.3d 985, 990-92 (Ind. 2015)). But neither *Bean* nor *Kindred* cites, let alone discusses and applies, our Supreme Court's precedent in *Brown*. *See Bean*, 15 N.E.3d at 18; *Kindred*, 973 N.E.2d at 1252. Nor does either opinion reference our Supreme Court's consistent direction that fundamental error requires a showing that the trial court should have acted *sua sponte* to avoid the error. *See Bean*, 15 N.E.3d at 18, 22-23; *Kindred*, 973 N.E.2d at 1252, 1258-59. Indeed, one wonders how our trial court judges even can interject themselves to avoid a "cumulative effect" fundamental error analysis. *Cf. Durden*, 99 N.E.3d at 652 (stating that

fundamental error "encompasses only errors so blatant that *the trial judge should have acted independently* to correct the situation") (emphasis added; quotation marks omitted). In any event, we are bound by our Supreme Court's precedents, not the opinions of other panels of this Court, and we therefore decline to follow *Bean* and *Kindred*.

[26] The trial court properly did not betray its role as an impartial adjudicator to act on Bolcerek's behalf, and Bolcerek is unable to show fundamental error in the admission of the standoff evidence.

## 2. Bolcerek's conviction for Level 6 felony battery, as charged in Count 5, violates his substantive double jeopardy rights, but none of his other convictions do.

[27] We next turn to Bolcerek's argument that several of his convictions are contrary to Indiana's protection against substantive double jeopardy. We review such questions de novo. *A.W. v. State*, 229 N.E.3d 1060, 1064 (Ind. 2024).

[28] Indiana's protection against substantive double jeopardy prohibits "multiple convictions for the same offense in a single proceeding." *Id.* at 1066. To determine if a substantive double jeopardy violation has occurred, we apply a "three-part test based on statutory sources . . . ." *Id.* The first step is to look to the statutory language of the offenses at issue; if that language "clearly permits multiple punishments," then "there is no violation of substantive double jeopardy." *Id.* (quotation marks omitted). Here, Bolcerek and the State agree

that the first step is not dispositive as to any of Bolcerek's double jeopardy arguments.

[29] We thus turn to the second step. At this step, as clarified by our Supreme Court in *A.W.*, we look to the face of the charging information to discern if the factual bases identified for the charges implicate our statutory definitions of an "included offense." *Id.* In particular, the Indiana Code defines an included offense as an offense that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

Ind. Code § 35-31.5-2-168 (2021). As our Supreme Court has further clarified, an offense is also an included offense where the charging information states that the "means used" to commit the alleged greater offense "include all of the elements of the alleged lesser included offense." *A.W.*, 229 N.E.3d at 1067 (quotation marks omitted).

[30] This step of our substantive double jeopardy analysis creates a risk of "an asymmetrical benefit to the State" because a prosecutor may "unilaterally

decide how much" information "to include (or not include) in the charging instrument, which could decisively determine the outcome of a double jeopardy claim." *Id.* at 1069 (emphasis omitted). Thus, to eliminate that asymmetry, our Supreme Court requires that, "where ambiguities exist in a charging instrument about whether one offense is factually included in another, courts must construe those ambiguities in the defendant's favor[] and thus find a presumptive double jeopardy violation at Step 2." *Id.*

[31] Bolcerek first asserts that the face of the charging information fails to distinguish Count 2 (Level 5 felony criminal recklessness) and Count 7 (Level 6 felony pointing of a firearm) from Count 4 (Level 5 felony intimidation). The charging information described Count 4, the alleged greater offense, in relevant part as follows:

> on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did communicate a threat with the intent that another person be placed in fear that the threat will be carried out and the threat is to commit a forcible felony and Gary Bolcerek used or dre[w] a deadly weapon during the communication of the threat, to wit: Gary Bolcerek entered the home of Warren Byrge while armed with a handgun, pointed the handgun into Warren's face, and threatened to kill Warren if he called the police . . . .

Appellant's App. Vol. 2, p. 22. And the charging information described Count 2 and Count 7, the alleged included offenses, in relevant part as follows:

> [Count 2:] on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did recklessly, knowingly

or intentionally p[er]form an act that creates a substantial risk of bodily injury to another person and the act [wa]s committed by shooting a firearm into an inhabited dwelling or other building or place where people are likely to gather, to wit: Gary Bolcerek entered the home of Warren Byrge [and,] while armed with a handgun[,] fired the handgun into an interior wall of Warr[e]n's residence . . . .

\* \* \*

[Count 7:] on or about June 10, 2022 in the County of Porter, State of Indiana, GARY BOLCEREK did knowingly or intentionally point[] a loaded firearm at Warren Byrge, to wit: Gary Bolcerek entered the home of Warren Byrge [and,] while armed with a handgun[,] pointed [the] handgun into Warren's face. Gary also fired a shot into Warren's residence during this encounter indicating that the firearm was loaded . . . .

*Id.* at 21, 23.

[32] The face of the charging information plainly distinguishes Counts 2 and 4. Count 4 is premised on "Bolcerek enter[ing] the home of Warren Byrge while armed with a handgun, point[ing] the handgun into Warren's face, and threaten[ing] to kill Warren if he called the police." *Id.* at 22. Count 2, however, is premised on Bolcerek having "fired the handgun into an interior wall of Warr[e]n's residence." *Id.* at 21. Accordingly, Count 2 is not included in Count 4 as charged, and there is no substantive double jeopardy violation with Bolcerek's convictions for both of those counts.

[33] However, the face of the charging information does not distinguish between Counts 4 and 7. Again, Count 4 is premised on Bolcerek entering Byrge's home

while armed, "point[ing] the handgun into Warren's face, and threaten[ing] to kill Warren if he called the police." *Id.* at 22. Likewise, Count 7 is premised on Bolcerek "enter[ing] the home of Warren Byrge[,] while armed with a handgun[, and] point[ing] [the] handgun into Warren's face." *Id.* at 23. On the face of the charging instrument, those two allegations are not clearly distinct offenses. Accordingly, the manner in which the State drafted the information between those two offenses created a rebuttable presumption of a substantive double jeopardy violation, and, for those two charges, we proceed to the third step of the analysis. *See A.W.*, 229 N.E.3d at 1069.

[34] The third and final step of our substantive double jeopardy analysis gives the State the opportunity to rebut the presumptive double jeopardy violation. To do so, "the State must demonstrate that it made clear to the fact-finder at trial that the apparently included charge was supported by independent evidence such that the State made a 'distinction between what would otherwise be two of the same offenses.'" *Ratliff v. State*, 242 N.E.3d 1070, 1078-79 (Ind. Ct. App. 2024) (quoting *A.W.*, 229 N.E.3d at 1071), *trans. denied*. However, if the State's evidence at trial "shows only a single continuous crime, and one statutory offense is included in the other," the State may not obtain cumulative convictions. *Id.* at 1079 (quotation marks and brackets omitted).

[35] We agree with the State that its arguments to the jury sufficiently distinguished Counts 4 and 7 and, thus, rebutted the presumptive double jeopardy violation. During its closing argument, the State explained that Bolcerek had attacked Byrge and "point[ed] the gun at him" while saying "I wish I could shoot you. I

want to kill you so bad," immediately followed by Bolcerek discharging a round into Byrge's wall. Tr. Vol. 4, pp. 81-82. The State then explained that "it was *after that* that . . . [Bolcerek] threatened [Byrge] as well" by stating "[i]f I go to jail for this, then my friends will get you." *Id.* at 86 (emphasis added). Further, in describing Count 4 to the jury, the State emphasized that the offense occurred when Bolcerek "communicated those threats" to Byrge, and, "while committing it, [Bolcerek] was armed . . . ." *Id.* at 92-93.

[36]   Thus, the State asked the jury to find Bolcerek guilty of Level 6 felony pointing of a firearm, as charged in Count 7, for pointing the handgun into Byrge's face during the physical attack. And the State asked the jury to find Bolcerek guilty of Level 5 felony intimidation, as charged in Count 4, for threatening Byrge, while armed, with retaliation if Byrge contacted police. The State therefore made a clear distinction between the two offenses and did not present the jury with only a single continuous crime here. Accordingly, there is no substantive double jeopardy violation with respect to Bolcerek's convictions for Counts 4 and 7.

[37]   Finally, Bolcerek also argues that his convictions for Count 3 (Level 5 felony battery) and Count 5 (Level 6 felony battery) violate substantive double jeopardy. The State concedes this argument, and we accept the State's concession. We therefore reverse Bolcerek's conviction for Level 6 felony battery as charged in Count 5 and vacate the corresponding (one-year concurrent) sentence entered for that offense. *See, e.g.*, *Wadle v. State*, 151 N.E.3d 227, 256 (Ind. 2020) (vacating the offense with the lesser penalty); *see*

*also Eversole v. State*, ___ N.E.3d ___, 2025 WL 424830, at *3 (Ind. Ct. App. Feb. 7, 2025) ("With one of the two convictions vacated, there is no longer a double jeopardy violation."). Bolcerek's aggregate twenty-six year sentence remains unchanged.

## 3. Bolcerek's aggregate sentence is not inappropriate.

[38]     Bolcerek's final argument on appeal is that his aggregate twenty-six year sentence is inappropriate in light of the nature of the offenses and his character. Under Indiana Appellate Rule 7(B), we may modify a sentence that we find is "inappropriate in light of the nature of the offense and the character of the offender." Making this determination "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[39]     Sentence modification under Rule 7(B), however, is reserved for "a rare and exceptional case." *Livingston v. State*, 113 N.E.3d 611, 612 (Ind. 2018) (per curiam). Thus, when conducting this review, we generally defer to the sentence imposed by the trial court, and that deference will prevail unless the defendant demonstrates compelling evidence on appeal that portrays the nature of the offenses and his character in a positive light, such as showing a lack of brutality in the offenses or showing substantial virtuous character traits. *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[40]     In light of our above holdings, Bolcerek stands convicted of one Level 2 felony, three Level 5 felonies, and two Level 6 felonies. A Level 2 felony carries a sentencing range of ten to thirty years with an advisory term of seventeen and one-half years. I.C. § 35-50-2-4.5. A Level 5 felony carries a sentencing range of one to six years with an advisory term of three years. I.C. § 35-50-2-6(b). And a Level 6 felony carries a sentencing range of six months to two and one-half years, with an advisory term of one year. I.C. § 35-50-2-7(b). Thus, for his convictions, Bolcerek faced a possible maximum term of fifty-three years.

[41]     After a sentencing hearing, the trial court here found the following aggravating circumstances: that this was a "senseless home invasion," that Bolcerek had "lied" to the jury during his defense, and that Bolcerek has a significant criminal history, including prior battery offenses and violations of the conditions of his pretrial release. Tr. Vol. 4, pp. 137-38. The court found the following mitigating circumstances: Bolcerek's expression of remorse and the hardship his incarceration will have on his dependents. The court then ordered Bolcerek to serve twenty years for Level 2 felony burglary; three years for Level 5 felony criminal recklessness; three years for Level 5 felony battery; three years for Level 5 felony intimidation; one year for Level 6 felony strangulation; and one year for Level 6 felony pointing of a firearm. The court ordered the twenty-year sentence, the three-year sentence for Level 5 felony criminal recklessness, and the three-year sentence for Level 5 felony battery to be served consecutively, with all other sentences to be served concurrently with the Level

5 felony battery sentence. Thus, Bolcerek's aggregate sentence is twenty-six years executed in the Department of Correction.

[42] Bolcerek argues that he should receive the advisory sentence of seventeen and one-half years for his Level 2 felony with all other sentences ordered to run concurrently with that sentence. In support of his argument, he argues that his offenses were not significantly more serious than any other Level 2, Level 5, or Level 6 felony offense; that the amount of time over which he committed his several offenses was relatively short; and that his offenses all involved the same victim. He also argues that he has a high school education; that he was employed full-time; that he is married and has a daughter and a step-son; and that he acknowledged at sentencing that he made poor decisions on the day of the offenses. He also diminishes the importance of his criminal history.

[43] Bolcerek's arguments on appeal simply seek to have our Court substitute its judgment for that of the trial court, which is not consistent with our deference to the trial court on sentencing matters. Bolcerek does not present any compelling evidence that portrays the nature of the offenses or his character in a positive light, and we agree with the trial court's assessment of the nature of the offenses and Bolcerek's character. We therefore affirm his aggregate twenty-six year sentence.

## Conclusion

[44] For all of these reasons, we affirm Bolcerek's convictions for Level 2 felony burglary, Level 5 felony criminal recklessness, Level 5 felony battery, Level 5

felony intimidation, Level 6 felony strangulation, and Level 6 felony pointing of a firearm, and we affirm his aggregate twenty-six year sentence. We reverse Bolcerek's conviction for Level 6 felony battery.

[45] Affirmed in part and reversed in part.

Foley, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

James E. Harper
Harper & Harper, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Robert M. Yoke
Deputy Attorney General
Indianapolis, Indiana